PETERKIN, Otis H.; Albrecht, Alfred F.; Truesdale, Mack; Maxwell, Frederick; Harris, Richard; Lesko, John; Floyd, Calvin; Morris, James; Logan, Ronald; Crenshaw, Robert; Lee, Charles N.; Colson, Martin; Yarris, Nicholas; Cross, Charles; Smith, Donald; individually and on behalf of all others similarly situated, Appellants,

v.

Glen JEFFES, individually and as the Acting Commissioner of the Bureau of Corrections of the Commonwealth of Pennsylvania and as The Superintendent of the State Correctional Institution at Graterford; Ronald Marks, individually and as the former Commissioner of the Bureau of Corrections; Julius Cuyler, individually and as the former Superintendent of the State Correctional Institution at Graterford; Charles H. Zimmerman, individually and as Superintendent of the State Correctional Institution at Huntingdon; and George Petsock, individually and as Superintendent of the State Correctional Institution at Pittsburgh.

No. 87–1312.

United States Court of Appeals,
Third Circuit.

Argued Dec. 1, 1987.
Decided Aug. 23, 1988.

**1022**

Stefan Presser (argued), American Civil Liberties Union of Pennsylvania, Philadelphia, Pa., for appellants.

Maria Parisi Vickers (argued), Deputy Atty. Gen., Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM, MANSMANN and WEIS *, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Two constitutional issues are raised on appeal in this class action: whether prisoners sentenced to death by the Commonwealth of Pennsylvania and currently imprisoned at the State Correctional Institutions at Graterford and Huntingdon are confined in conditions constituting cruel and unusual punishment prohibited by the eighth amendment, and whether the Commonwealth and its prison officials are providing these prisoners with sufficient legal resources to vindicate their constitutional right of access to the courts. In deciding these issues, we are primarily guided by the Supreme Court's decisions in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), applying the eighth amendment to prison conditions, and *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct.

1491, 52 L.Ed.2d 72 (1977), holding "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. The district court found that the prison conditions in Pennsylvania's death rows do not violate the eighth amendment. *Peterkin v. Jeffes*, 661 F.Supp. 895, 926 (E.D.Pa.1987). We agree that the prisoners have not established that the totality of the conditions of their confinement constitutes cruel and unusual punishment. Based on its factual finding that "all of the capital inmates have access to counsel," *id.* at 928, the district court also held that the Commonwealth provides death-sentenced prisoners constitutionally adequate legal resources. Our view is that certain of the district court's factual findings related to this issue are unsupported by the record. We will affirm the district court's opinion on the plaintiffs' eighth amendment claim, vacate the district court's holding concerning access to the courts, and remand for proceedings consistent with this opinion.

### I. Prior Proceedings

The Commonwealth of Pennsylvania reinstated capital punishment in 1978. 42 Pa.Cons.Stat.Ann. § 9711 (Purdon 1982). From that time until November, 1982, the state incarcerated prisoners under sentence of death among the general population in the state's maximum security correctional institutions at Graterford, Huntingdon and Pittsburgh. In November, 1982, after the death penalty statute withstood constitutional challenges, the Commissioner of Corrections, Ronald Marks, decided that henceforth all prisoners under sentence of death would be confined in those prisons' Restricted Housing Units (RHU's) in administrative custody. This litigation began in January, 1983, when a group of death-sen-

---

* At the time of oral argument on this appeal, Honorable Joseph F. Weis, Jr. was an active circuit judge. Judge Weis has since taken senior judge status.

tenced prisoners,[1] acting *pro se*,[2] filed a complaint against officials of the Commonwealth of Pennsylvania and its Bureau of Corrections[3] on behalf of all such prisoners, alleging that the Department of Corrections' decision to segregate them on "death rows" violated their rights to equal protection of the laws and substantive due process under the fourteenth amendment to the Constitution. They also challenged and sought relief from certain rules and conditions of confinement in the RHU's, alleging that these violated the eighth amendment's prohibition on cruel and unusual punishment, the first amendment's guarantee of the free exercise of religion, and the constitutional right of access to the courts.

In June, 1984, the district court, exercising jurisdiction under 28 U.S.C. § 1343 (West Supp.1986), and in response to a motion for summary judgment by the Commonwealth defendants, dismissed the plaintiff-class's[4] fourteenth amendment challenges to the decision by the Bureau of Corrections to segregate death-sentenced prisoners. On the conditions of confinement issues, the district court held a bench trial, including nine days of testimony, two of which took place at Graterford, where death row inmates from both Graterford and Huntingdon testified. The trial judge also visited the RHU at Graterford twice,

in June and December, 1986. On May 4, 1987, the district court entered its decision and order granting judgment in favor of Pennsylvania's prison officials on all claims. *Peterkin v. Jeffes*, 661 F.Supp. 895 (E.D.Pa.1987). The plaintiff-class filed a timely appeal.

## II. The Eighth Amendment Challenge

### A. *Cruel and Unusual Punishment*

For conditions of confinement in prisons to constitute cruel and unusual punishment within the meaning of the eighth amendment of the constitution,[5] the Supreme Court, in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), has said that these conditions "must ... involve the wanton and unnecessary infliction of pain, [or] be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. The eighth amendment, the Court instructed, " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Id.* at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Today the eighth amendment prohibits the denial of medical care, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976), "because, in the worst case,

1. The plaintiffs who brought this case are: Otis H. Peterkin; Alfred F. Albrecht; Mack Truesdale; Frederick Maxwell; Richard Harris; John Lesko; Calvin Floyd; James Morris; Ronald Logan; Robert Crenshaw; Charles N. Lee; Martin Colson; Nicholas Yarris; Charles Cross; and Donald Smith.

2. Counsel entered an appearance on behalf of plaintiffs within four months of the filing of the complaint. Substitute counsel entered an appearance approximately four months later. Current counsel entered an appearance in May, 1985.

3. The defendants in this action, named individually and in their official Commonwealth capacities, are Glen Jeffes, Commissioner of the Bureau of Corrections and Superintendent of the State Correctional Institution at Graterford; Charles H. Zimmerman, Superintendent of the State Correctional Institution at Huntingdon; and George Petsock, Superintendent of the State Correctional Institution at Pittsburgh.

4. At the same time, the district court granted the plaintiffs' motion for class certification under **Fed.R.Civ.P.** 23(a) and 23(b)(2). For purposes of the several challenges to the conditions of confinement, the class certification order included all prisoners in administrative segregation at the State Correctional Institutions at Graterford, Huntingdon, and Pittsburgh during the pendency of the proceeding. With the approval of all parties, the district court, in June, 1986, immediately prior to trial, amended its class certification order to narrow the class to include only those inmates in the three RHU's during the pendency of the litigation who are sentenced to death. At the time of trial, all of Pennsylvania's capital prisoners were housed at either Graterford or Huntingdon. *See Peterkin*, 661 F.Supp. at 900.

5. The eighth amendment is applicable to the states through the fourteenth amendment. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. The "dark and evil world," *Holt v. Sarver*, 309 F.Supp. 362, 381 (E.D.Ark.1970) (*Holt II*), of the Arkansas prison described in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), imposed cruel and unusual punishment on its prisoners, the Supreme Court held, because its conditions "resulted in unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

Although the Supreme Court recognizes there is "no static 'test' ... by which courts [can] determine whether conditions of confinement are cruel and unusual," *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399, the inquiry that courts must conduct in eighth amendment cases is not consequently less exacting. "'Eighth Amendment judgments,'" the Court teaches, "'should neither be nor appear to be merely the subjective views' of judges." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980)). Rather, these judgments "'should be informed by objective factors to the maximum possible extent.'" *Rummel v. Estelle*, 445 U.S. at 274–75, 100 S.Ct. at 1139 (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion)), *quoted in Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399. Impartiality and objectivity, however, do not provide a haven from judicial responsibility. "[T]he Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability' of a given punishment." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Coker v. Georgia*, 433 U.S. at 597, 97 S.Ct. at 2868; citing *Gregg v. Georgia*, 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976)).

The district courts bear an especially critical burden of responsibility in eighth amendment cases involving prison conditions, because "[a] reviewing court is generally limited in its perception of a case to the findings of a trial court," *Rhodes*, 452 U.S. at 365, 101 S.Ct. at 2408 (Brennan, Blackmun and Stevens, JJ., concurring). That this case concerns Pennsylvania's death rows and is a class action on behalf of all the state's death row prisoners, increases the solemn and sensitive nature of the judicial inquiry. The district court's opinion, in our view, reflects an acute awareness of that responsibility and a conscientious and thoughtful effort to discharge it.

We find no flaw in the district court's method of analyzing the eighth amendment issues in this case. In actions challenging a large number of prison conditions, a district court, we agree, must inquire whether "the challenged conditions 'alone or in combination'" violate eighth amendment standards, "recognizing that the totality of the conditions 'may deprive inmates of the minimal civilized measure of life's necessities.'" *Peterkin*, 661 F.Supp. at 900 (quoting *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399). This approach reflects the Supreme Court's language and analysis in *Rhodes* and adheres to this Court's articulation of the proper analysis in eighth amendment cases involving multiple prison conditions. *See Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 999 (3d Cir.1983) (in a challenge to jail overcrowding, court must consider not only cell size, but also other circumstances bearing on the nature of the shelter afforded inmates), *cert. denied, sub nom. Union County Jail Inmates v. Fauver*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 and *sub nom. DiBuono v. Fauver*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984); *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir.1981) ("none of the[ ] conditions, either singly or in combination, approached constitutional inadequacy"), *cert. denied, sub nom. Stanley v. Zimmerman*, 462 U.S. 1137, 103 S.Ct. 3123, 77 L.Ed.2d 1375 (1983); *accord Hassine v. Jeffes*, 846 F.2d 169 (3d Cir.1988).[6] We

---

6. *Accord Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir.1982) *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). "Rhodes holds that the confinement of two persons in one cell is not per se cruel and unusual punishment when, all prison conditions having been con-

agree with the district court that the objective factors which a court must examine in prison conditions cases include "basic human needs such as food, shelter, and medical care, as well as sanitation, safety, the physical plant, educational/rehabilitational programs, the length of confinement, and out-of-cell time." *Peterkin*, 661 F.Supp. at 900. In *Di Buono*, we recognized the importance of such objective factors stating that in assessing "the totality of circumstances relevant to any alleged constitutional deficiency in shelter," *id.* at 1000, we must consider, in addition to the "general state of repair and function of the facilities provided," *id.* at 1001, the length of confinement in the prison, *id.* at 1000 (quoting *Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978)); how much time prisoners must spend in their cells each day, *id.* (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir.1982)); and "the opportunities for inmate activities outside of the cells." *Id.* These factors are as relevant to a challenge to the totality of the conditions of confinement as they are to a challenge focused on the size of the cells and overcrowding, as in *Di Buono*.[7]

The prisoners question not these legal precepts but rather the district court's application of them in this case. Essentially, they argue that the district court failed to render a judgment based on objective indicia as mandated by the Supreme Court with regard to three interrelated aspects of confinement: cell conditions; time spent in the cells and prisoner activities and services; and the prisons' exercise policy. The gravamen of the prisoners' appeal is that the conditions of the cells are cruel and unusual when analyzed in relation to the daily regimen that the Commonwealth imposes on death-sentenced prisoners, which appellants characterize as one of excessive mental and physical idleness. The prisoners argue that the prison regime results in their psychological and physical deterioration and that it is without penological justification. Specifically, appellants contend that the district court erred in not concluding that confining death row prisoners to their cells for approximately twenty-two hours a day constitutes cruel and unusual punishment, in view of (1) the size and condition of the cells; (2) the restricted activities and services, including medical, psychological, religious, and legal services, which occupy the prisoners and sustain their mental health; and (3) the Commonwealth's exercise policy, which the prisoners contend deprives them of meaningful exercise for three reasons: the lack of any indoor exercise facilities for death sentenced prisoners; the practice of placing prisoners in individual, enclosed outdoor exercise yards; and the Commonwealth's ban on group exercise by capital inmates. The prisoners argue that the exercise policy, particularly the total deprivation of group recreation, when considered in conjunction with the extended time for which prisoners must remain in their cells and the all but total lack of opportunities to participate in remunerative prison work programs or other organized activity, denies prisoners on death row the meaningful intellectual stimulation and human interaction necessary to

---

sidered, 'alone or in combination,' inmates are not deprived of the 'minimal civilized measure of life's necessities.'" *Id.* at 1139. *See also, Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) ("We find no error in the court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.")

7. To the extent raised by the prisoners, the district court properly considered the following enumerated in *Rhodes:*

the effect upon inmates of the condition of the physical plant (lighting, heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working); safety (protection from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programing); and staffing (trained and adequate guards and other staff, avoidance of placing inmates in positions of authority over other inmates).

*Rhodes*, 452 U.S. at 364, 101 S.Ct. at 2408 (Brennan, J. concurring).

prevent their mental deterioration, and constitutes cruel and unusual punishment in violation of the eighth amendment. We determine whether these claims, which implicate each of the *Di Buono* factors, state constitutional violations by a plenary review of the district court's extensive findings of fact and conclusions of law.

### B. *Findings by the District Court*
### 1. Cell Conditions

At the time of the trial of this case, Pennsylvania incarcerated all of its prisoners under sentence of death in the State Correctional Institutions at Graterford and Huntingdon. *Peterkin,* 661 F.Supp. at 900. Both are maximum security prisons. Graterford's RHU, which the court found to be a fairly modern building, is a one-level, U-shaped structure separate from the prison's main building. *Id.* at 900. The district court found that it has a maximum capacity of thirty-six inmates; at the time of trial, twenty death-sentenced prisoners were held there. *Id.* at 901. One wing of the RHU houses death-sentenced prisoners; in the middle section are some inmates in disciplinary custody and some under a capital sentence; the third wing houses prisoners with psychiatric problems. *Id.* at 900. Because of Graterford's proximity to Farview State Hospital, Pennsylvania's only maximum security psychiatric hospital, the Commonwealth generally sends death-sentenced prisoners with "significant psychiatric histories" to Graterford. *Id.* at 901.

The State Correctional Institution at Huntingdon at the time of trial housed forty-two prisoners sentenced to death. *Id.* at 901. Its RHU is on "B" block, one cellblock of six that extend like spokes from the institution's center, each containing three vertically stacked levels of cells. *Id.* at 901. RHU cells, housing between 145 and 150 prisoners, are located in the center of "B" block, and there is an adjoining RHU annex housing ninety additional inmates. Inmates sentenced to death occupy the fifth and sixth tiers, which are the second and third levels of "B" block. Jt. App. at 330a.

■ The district court made numerous factual findings concerning every physical aspect of the prison cells in both prisons about which the class complained: size; temperature and ventilation; lighting; bedding; the adequacy of the furnishings; cell sanitation and maintenance, including the condition of the toilets, sinks, walls and ceilings, and the cleaning and inspection procedures; and the noise level in the RHU's. *Peterkin,* 661 F.Supp. at 903–910. The court found, *inter alia,* that "[t]he space available to each inmate is more than adequate," *id.* at 904; [8] that although there was a lack of significant airflow in the cells at Huntingdon and to a lesser extent at Graterford, there was no manifestation of the development and spread of infectious respiratory disease or any other risk to inmate health, *id.* at 905; that while more light might be preferable, the lighting in

---

**8.** In their appeal, the prisoners assert that the cells do not afford them space deemed acceptable by any responsible penal association, including the American Correctional Association, which recommends eighty square feet per cell. *Peterkin,* 661 F.Supp. at 903. Huntingdon's cells measure seventy-one square feet, forty-six square feet of which the district court found usable for movement; Graterford's measure sixty square feet, affording thirty-eight square feet for movement. *Id.* While the cell size in both RHU's falls short of at least some experts' current ideal, the opinions of experts, although helpful and relevant, do not "suffice to establish contemporary standards of decency," for purposes of eighth amendment challenges, and "[i]ndeed, generalized opinions of experts cannot weigh as heavily in determining [these standards] as 'the public attitude toward a given sanction.'" *Rhodes,* 452 U.S. at 348 n. 13, 101

S.Ct. at 2400 n. 13 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed. 2d 859 (1976)). In *Rhodes,* the Supreme Court rejected an eighth amendment challenge to double-bunking in cells measuring approximately sixty-three square feet, *Rhodes,* 452 U.S. at 341, 101 S.Ct. at 2396; Graterford's RHU cells, in which double bunking does not occur, do not provide significantly less space than the cells found adequate in *Rhodes.* The plaintiffs also introduced no evidence of the communication of respiratory disease, and the district court found, based on observation, that the capital inmates have ample space in which to move about. Under the circumstances, we do not find clearly erroneous the district court's conclusion that the size of RHU cells in which death-sentenced prisoners are housed is constitutionally sufficient.

the cells is more than adequate and had not been the cause of any eye damage, *id.* at 906; that while some inmates remove their mattresses from the bedframes and place them on the floor, there is no evidence that this practice, or the bedframes when used, or the sanitation of the bedding supplies, had caused a "single incident of serious back problems or the transmission of disease. causing organisms," *id.* at 907; that the food served to the plaintiff-class is nutritionally adequate, *id.* at 922; and that the noise in the cells, while it may be irritating to some prisoners, cannot fairly be said to inflict cruel and unusual punishment. *Id.* at 910.

Notwithstanding its finding of constitutional adequacy, the district court did not commend the Commonwealth for the conditions of the death row cells and expressed concern at its apparent complacency with respect to certain problems. *Peterkin*, 661 F.Supp. at 909. The court found that the toilets at both institutions appear functional and generally in a state of good repair, but that "it is obvious that many are dirty, some are filthy." *Peterkin*, 661 F.Supp. at 908. The condition of the sink facilities at Graterford "could be better," plaster walls at Huntingdon, the court found, warranted prompt repairs, and some cells "are in dire need of fresh paint." *Id.* At Graterford, the district court discovered lime deposits in the showers caused by lack of ventilation, which it found should be rectified. *Id.* at 915. About the level of sanitation and maintenance in general, the district court concluded that "[e]ven though the existing conditions do not inflict cruel and unusual punishment ..., [w]ithout attention, these conditions could cross the threshold proscribed by the eighth amendment in the foreseeable future." *Id.* at 909.

Our review of the district court's findings and conclusions concerning physical conditions in the plaintiff-class's cells does not persuade us that the district court failed to base its holding that these do not constitute cruel and unusual punishment on objective indicia. Having inspected the RHU's, heard the testimony of prisoners, prison officials and experts, and consulted the standards of the American Correctional Association (ACA),[9] the district court weighed all the evidence and concluded, in each instance, that the condition in question withstood eighth amendment scrutiny. In each instance of the allegedly unconstitutional physical conditions the district court searched for a health risk and found none manifested. The district court did not find the conditions dangerous, *see Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.1985), intolerable, or shockingly substandard, *see Inmates of Allegheny Co. Jail v. Pierce*, 612 F.2d 754, 757 (3d Cir.1979). We conclude that the physical conditions in the cells, as described by the district court, do not engender an "unquestioned and serious deprivation of basic human needs," *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399, and in our view do not deprive inmates of "the minimal civilized measure of life's necessities." *Id.* "[T]he Constitution does not mandate comfortable prisons, and prisons ... [that] house persons convicted of serious crimes, cannot be free of discomfort." *Id.* at 349, 101 S.Ct. at 2400.

We nevertheless view the district court's concerns regarding sanitation and maintenance as of the greatest significance. Sanitation is one of the basic human needs recognized by eighth amendment cases, *see Union County Jail Inmates v. Di Buono*, 713 F.2d at 998 n. 19 (citing *Rhodes*, 452

9. The American Correctional Association and the Commission on Accreditation for Corrections *develop and publish the Standards for Adult Correctional Institutions* (1981 and Supp. 1986, 1988) ("Standards"), setting over 450 standards for evaluating every aspect of prison life. To be accredited by the Commission on Accreditation for Corrections, a prison must meet all "mandatory" standards, ninety percent of the "essential" standards and eighty percent of the "important" standards. *Standards* at xvii. At the time of trial, Graterford was not accredited but planned to take the initial step toward accreditation in fiscal year 1986–1987. *Peterkin*, 661 F.Supp. at 901 n. 2. Huntingdon was accredited in 1984. *Id.* at 901. According to the Supreme Court, standards promulgated by prison experts " 'do not establish the constitutional minima; rather they establish goals recommended by the organization in question.' " *Rhodes*, 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Bell v. Wolfish*, 441 U.S. 520, 543–44, n. 27, 99 S.Ct. 1861, 1876, n. 27, 60 L.Ed.2d 447 (1979)).

U.S. at 348, 101 S.Ct. at 2400). However, it appears to us that the Commonwealth on appeal encourages us to believe that the Commonwealth prison authorities do not view any of the district court's concerns with indifference. According to the Commonwealth and the district court there has been some amelioration of the cell conditions at Huntingdon: some cells are being painted, Jt. App. at 752a; the ventilation system is being repaired, *id.;* beds with slats too far apart for comfortable sleeping have been replaced with beds with a solid base, *Peterkin,* 661 F.Supp. at 907; a seat and desk unit for each cell is being distributed, although at the time of re-inspection all cells did not yet have one, *id.* at 917; fluorescent lighting has been installed throughout the RHU, *id.* at 906; ash trays are now being provided to reduce the risk of fire caused by cigarettes, Jt. App. at 742a, and food is now being served on thermal trays, *Peterkin,* 661 F.Supp. at 922, Jt. App. at 742a. By the time of the district court's final inspection of Graterford's RHU, a fan had been installed to ventilate the shower area. *Id.* at 915.[10]

### 2. Cell Time and Prisoner Activities

Appellants argue that the Commonwealth's policy of confining death-sentenced prisoners to their cells for approximately twenty-two hours a day in a condition of imposed idleness and without adequate opportunity for human interaction violates the eighth amendment. There is no dispute about the facts of the Commonwealth's policies concerning cell time and prisoner activities. Death row prisoners are permitted to leave their cells infrequently, for circumscribed purposes: to shower, at Graterford on alternate days, at Huntingdon three times weekly, *Peterkin,* 661 F.Supp. at 915; at Huntingdon, once a month to make a telephone call[11], *id.* at 915; to appear, at their option, once a month for ten to thirty minutes before the Program Review Committee, *id.* at 915–16; to receive visitors, up to four at Graterford and five at Huntingdon, once a week from behind a glass divider in a supervised, locked visiting area, in addition to supplemental visits from religious advisors and attorneys, *id.* at 914. Group religious worship, communal meals, and visits to the law library are prohibited. Graterford inmates are assigned to perform janitorial tasks in the RHU for five hours a day for one month each year; this is the only participation in prison work programs allowed appellants, *id.* at 915. In the cells, self-teaching elementary educational materials are available, free of charge upon request, and prisoners who can afford them may purchase more advanced materials, *id.* at 917. The Commonwealth provides free postage for ten letters a month, *id.* at 916. Prisoners may obtain law library books upon individual request, through a paging system. *Id.* at 920–22.[12] The district court found that the prisoners have radios and televisions in their cells and that the prisoners converse with one another between cells. *Id.* at 917. Finally, the district court found that there are regular visits to the prisoners' cells by psychologists, psychiatrists, counselors, and a medical doctor, and that it is possible to engage in a private

---

10. The district court found that the Commonwealth is currently undertaking a $300 million prison construction and renovation program. *Peterkin,* 661 F.Supp. at 902. Included in the plan is a new RHU at Graterford, consisting of 104 beds, twenty-eight outside recreation areas, and five day rooms. *Id.* The district court does not specify whether the plans include a law library in the RHU. According to the district court, "the Commonwealth plans to phase out the present RHU, unless overcrowding dictates otherwise." *Id.* At the time of trial, Commonwealth officials projected a completion date of mid–1988. *Id.* The Commonwealth does not plan any new construction at Huntingdon. *Id.*

11. At Graterford, inmates may make weekly telephone calls from inside the cells, using telephones connected outside the cells, *Peterkin,* 661 F.Supp. at 915, although additional telephone calls to attorneys are permitted, as well as emergency calls on a case by case basis.

12. The paging system is discussed in greater detail in Part III of this opinion, in the context of appellants' access to courts claim. *See infra* typescript at 1033.

conversation at the cell by speaking in lowered tones. *Id.* at 917–19.[13]

Under *Di Buono,* we must consider, in addition to physical aspects of the cells, what effect, if any, the duration of appellants' confinement on death row will have on our analysis of the Commonwealth's policies regarding the time the prisoners must spend in their cells and the restrictions on their activities. The district court found that some of the prisoners had already been on death row for four years. The district court also observed, and we agree, that because of the deliberate pace of post-conviction review afforded death-sentenced prisoners, and political factors surrounding the decision to carry out an execution, the average length of confinement of death row prisoners will continue to increase. *See Peterkin,* 661 F.Supp. at 902–03; *see also Groseclose v. Dutton,* 609 F.Supp. 1432, 1447 (M.D.Tenn.1985) (average death row inmate spends six to ten years pursuing appeals).[14] Thus, in assessing the constitutionality of the conditions under which death-sentenced prisoners are confined, relative brevity of confinement cannot be a factor. *Cf. Smith v. Coughlin,* 748 F.2d 783 (2d Cir.1984).

■ Next, following the *Di Buono* factors, we must consider whether twenty-two hours of cell time daily is so excessive, relative to the physical conditions of the cells and the opportunities for activity outside the cells, that the confinement of capital inmates in this manner constitutes cruel and unusual punishment. We cannot say

that it does. Under the conditions that on this record exist at Graterford and Huntingdon, we cannot find even the relatively long period of cell confinement imposed on appellants to violate the eighth amendment. We arrive at this conclusion through consideration of physical and non-physical conditions in the prisons.

With respect to physical conditions, we have previously observed that "[i]n those cases where federal courts have found unconstitutional prison conditions, a decaying physical plant allowed by disrepair to become virtually inoperable has almost always provided an important background element." *Di Buono,* 713 F.2d at 1001 n. 30 (citing *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980); *Battle v. Anderson,* 564 F.2d 388 (10th Cir.1977)). Here, as in *Di Buono,* "there has been no finding that basic physical facilities such as plumbing, heating, ventilation, and showers, are inadequate." *Id.* The background element of a virtually inoperable physical plant is thus not present in the RHU's at Graterford and Huntingdon where death-sentenced prisoners are confined.

Turning to non-physical conditions, we understand appellants' arguments that they "are left to idle the years away in front of a television set," *Appellants' Brief* at 25, and that they are deprived of sufficient human interaction, to raise issues of mental, psychological, and emotional cruelty. We read the *Rhodes* Court as having stated that prison work and educational activities are rehabilitative in na-

---

**13.** We agree with the district court that the medical needs, including psychological needs, of the prisoners are serious, *see Peterkin,* 661 F.Supp. at 918, and that the system of medical care at Huntingdon and Graterford does not evince a deliberate indifference to these needs. *Id.* at 919. The prisoners' main concern is the lack of privacy in their meetings with counselors, psychologists and psychiatrists, since the meetings take place at the cell door. The district court based its conclusion that the prisoners have "reasonable access to medical personnel," *see Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979), not only on testimony that privacy could be achieved by lowered voices, but also that class members "rarely request such consultations, and the counseling personnel rarely deem them necessary" and that "on occasion, psychologists and

855 F.2d—24

psychiatrists have conducted interviews in the visiting room and kitchen to maximize privacy." *Peterkin,* 661 F.Supp. at 919. Based on this factual record, the district court did not err.

**14.** The Supreme Court of Pennsylvania recently granted the petition for stay of execution filed by one of the class members. *See Commonwealth v. Frey,* No. 81–3–393 (Pa. June 16, 1988) (per curiam). In this order, the court scheduled oral argument for September, 1988 on the question whether the statutory authorization for the Commonwealth's method of execution is constitutional. *Id. See Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398, 412 (1987) (Hutchinson, J.) (because no death warrant issued, question of method of execution not properly before the court).

ture, and that a showing that they have been diminished, with nothing more, does not constitute an eighth amendment violation. The Court stated: "[L]imited work hours and delay before receiving education do not inflict pain ·...; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. We do not understand the Supreme Court's teaching to be that prison authorities may turn a blind eye to the mental and emotional state of the prisoners, but only that a lack of stimulating activity such as complained of here does not by itself automatically "establish mental distress which will constitute cruel and unusual punishment." *Riley v. Jeffes*, 777 F.2d at 149 (Weis, J. dissenting).

Although the district court found that "[t]here is little dispute, even among the Commonwealth's experts, that many of the capital inmates are psychologically disturbed," *Peterkin*, 661 F.Supp. at 923, it appears that the district court sitting as a trier of fact was not persuaded that the emotional and psychological condition of the inmates is attributable to prison conditions other than the circumstance of living under a sentence of death, and for that reason concluded that the inmate psychological disturbances do not demonstrate an eighth amendment violation. *See Peterkin*, 661 F.Supp. at 926. In so concluding, the district court noted that, in testimony concerning the psychological condition of the death-sentenced inmates by experts from both sides, "[e]xperts for both sides agree that it is virtually impossible to de-

termine precisely to what extent the observed psychological disturbances are due to the conditions of confinement and to what extent they are due to the impending death by execution." *Peterkin*, 661 F.Supp. at 923. The district court also relied on the testimony of the staff psychiatrists at Graterford and Huntingdon, neither of whom, during their treatment of death-sentenced prisoners, which predated the administrative segregation of these prisoners, "observed psychological or psychiatric deterioration substantial enough to warrant confinement in a less restrictive environment." *Id.* at 919. It is not the province of this Court to disturb factual findings unless they are clearly erroneous and we do not find these to be clearly erroneous.[15]

The prisoners direct our attention to the findings of the district court in *Groseclose v. Dutton*, 609 F.Supp. 1432 (M.D.Tenn. 1985), especially the following:

> The evidence before the Court further indicates that defendants largely ignore the emotional well-being of the inmates. Inmate interaction with other human beings is insufficient; there are no educational or work programs available; the inmates are not permitted access to a dining room or a gymnasium; they may not leave their cells to visit the commissary or law library; and exercise ·opportunities are minimal. Counselling services ... are inadequate for so many men facing the death sentence. Of significant concern to the Court is that the inmates have no opportunity for congregate religious services.

*Id.* at 1446.[16] The district court's decision in *Groseclose*, however, is distinguishable

---

**15.** The district court's apparently alternative formulation of its conclusion on psychological harm, that "psychological disturbances ... are a function of the sentences imposed," *Peterkin*, 661 F.Supp. at 926, is not supported by the record in this case and we find it to be clearly erroneous. We note further that the district court relied in part on a decision in which the Seventh Circuit opined that " '[i]nactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time.' " *Peterkin*, 661 F.Supp. 895

at 923 (quoting *Bono v. Saxbe*, 620 F.2d 609, 614 (7th Cir.1980)). To the extent that this pronouncement by the district court purports to announce a legal standard, we do not adopt it. To the extent that the district court intended to articulate a factual conclusion as to causation of the capital inmates' emotional condition, we decline to disturb this finding on this record.

**16.** Because the district court in this case did not prescribe the contents of the remedial plan it ordered the state to submit, the Sixth Circuit dismissed the state's appeal for lack of appellate

from this case. There, the cells were much smaller; other significant aspects of the physical plant, including the lighting, toilets, temperatures, and sanitation, fell below the constitutional norm; the prisoners faced serious safety problems from both fire hazards and other inmates; and there was "[o]nly one counselor ... assigned for all forty-four inmates on death row, and that person is also the sole counselor for ... over eighty [other] inmates." *Id.* at 1437. Moreover, the district court in *Groseclose* specifically found "that the evidence is overwhelming that the defendants have not provided the inmates with adequate psychological and psychiatric assistance necessary for one confined and sentenced to death." *Id.*

### 3. Physical Exercise and Recreation

The prisoners' final objection to the totality of conditions on the Graterford and Huntingdon death rows is to the restrictions on physical exercise and recreation. Inmates under death sentence are permitted exercise outdoors for two hours a day. The exercise period is cancelled if the weather is inclement. During winter, the prisoners are provided with overcoats. At both institutions, the exercise yards for death row prisoners are divided into individual, adjoining exercise areas, each enclosed by a chain link fence with barbed wire at the top. Huntingdon's exercise spaces are nine by twenty feet. Those at Graterford measure twenty by fifty feet, except for one larger area, seventy-five by one hundred feet. Two prisoners at a time are permitted into these yards; inmates may select a fellow prisoner as an exercise companion if the prison authorities deem the pair compatible.

The prisoners contend that the individual exercise areas do not provide for meaningful physical activity because the time allowed for exercise is cruelly insufficient in relation to the hours of cell confinement and lack of any other out-of-cell activities. They further contend that the policies requiring them to exercise in yards resembling dog runs, and barring them from group exercise, are psychologically debilita-

ting and have contributed to their psychological deterioration while on death row. Appellants also argue that since none of the other states imposing the death penalty has instituted this policy on its death row the individual exercise yard policy is without penological justification. Appellants assert that the policy's psychological harm, lack of penological justification, and exceptional nature should lead this Court to reverse the district court's conclusion that the Commonwealth's policy restricting prisoners to exercise in pairs in small yards does not contravene the eighth amendment. We do not agree with appellants' contentions.

There is no question that meaningful recreation "is extremely important to the psychological and physical well-being of the inmates." *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979). *See also Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir.1982) ("[I]nmates need regular exercise to maintain reasonably good physical and psychological health"); *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir.1983); *Campbell v. Cauthron,* 623 F.2d 503, 506–07 (8th Cir. 1980); *Kirby v. Blackledge,* 530 F.2d 583, 587 (4th Cir.1976); *Loe v. Wilkinson,* 604 F.Supp. 130, 135 (M.D.Pa.1984). The evidence put forth by the plaintiff-class, however, does not support the conclusion that this exercise regimen violates the eighth amendment.

■ The district court found that the amount of time allotted for outdoor exercise exceeds the ACA standard of one hour daily, and approximates the nationwide average of three hours of daily outdoor exercise for death-sentenced inmates. *See Peterkin,* 661 F.Supp. at 911. The prisoners do not contest the district court's finding that they made no showing that protracted periods of inclement weather, which would substantially foreclose outdoor activity, occur with any frequency. *Id.* Nor do they argue that the district court overlooked any evidence that two hours of outdoor exercise a day is insufficient to maintain an adequate physical condition. Under these cir-

jurisdiction. *See Groseclose v. Dutton,* 788 F.2d 356, 361 (6th Cir.1986).

cumstances, we conclude that while the lack of indoor facilities might be less than ideal—indoor recreational facilities are recommended by the ACA—limiting capital inmates to two hours a day of outdoor exercise does not constitute a violation of their eighth amendment rights. The Commonwealth has recognized the utility of indoor exercise facilities and will make rooms available for this purpose in the new RHU's at Graterford and Pittsburgh.

The district court also did not find that the individual exercise yard policy is the cause of physical or psychological harm to the prisoners. The yards permit calisthenics, short distance jogging, and handball. The inmates point to no evidence of physical harm. What appellants in effect argue is that because the district court found that there are psychological disturbances among the prisoners, it must be concluded, in light of the prisoners' expert's opinion that the lack of group exercise contributes to these psychological problems, that the Commonwealth's exercise policy constitutes cruel and unusual punishment. However, as we have stated, the testimony of the experts on psychological harm was inconclusive. On this record, therefore, we cannot find that the opportunity to exercise with one companionable fellow prisoner, rather than to mingle in a larger group, deprives prison exercise of its efficacy so as to render it a cruel condition grossly disproportionate to the crimes committed.[17]

We also do not agree with appellants' contention that the Commonwealth's exercise policy is wholly without penological purpose. *See Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. The Commonwealth offered evidence sufficient to support a reasonable inference that group exercise might enable capital inmates to take concerted actions,

attempt escapes, or take hostages. We find that these increased risks to internal prison security represent substantial and legitimate concerns. The fact that other prison authorities responsible for death rows do not perceive a similar degree of risk or choose to respond to such a risk in the same way is not dispositive. Each prison is different, and the Supreme Court has repeatedly stated, and we have reiterated, that prison administrators must be afforded wide-ranging deference in adopting and carrying out policies that in their reasonable judgment are necessary to preserve order, discipline, and security. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

### C. *Summary*

Based on the factual findings before this Court, we conclude that the totality of the conditions comprising the punishment of prisoners under sentence of death at the State Correctional Institutions at Graterford and Huntingdon does not contravene the eighth amendment. We cannot, we believe, emphasize too often that although " 'confinement in a prison ... is a form of punishment subject to scrutiny under the Eighth Amendment standards,' " *Rhodes,* 452 U.S. at 345, 101 S.Ct. at 2398 (quoting *Hutto v. Finney,* 437 U.S. at 685, 98 S.Ct. at 2571), courts in assessing these claims "must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility,' " *Rhodes,* 452 U.S. at 351, 101 S.Ct. at 2401 (quoting *Bell v. Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874). The primary responsibility for operating prisons belongs to prison administrators, to other state law enforcement officials and to the state legis-

---

**17.** In the two cases considering prison exercise policy cited by the prisoners, the district court's findings of fact differed significantly from those in this case. In *Frazier v. Ward,* 426 F.Supp. 1354 (N.D.N.Y.1977), the district court held there was a denial of adequate exercise and recreation for the prisoner plaintiffs, based on a finding that the prisoners were not even regularly granted the one hour of outdoor exercise granted to them by state rule and an admission

by the state that such outdoor exercise periods could be regulated without interference with prison security. *Id.* at 1369. In *Groseclose v. Dutton,* 609 F.Supp. at 1436 (D.C.Tenn.1985), of death-sentenced prisoners holding that the conditions of confinement at Tennessee State Penitentiary violate the Eighth Amendment, the district court found that the inmates were permitted only one hour a day of exercise.

lature. The eighth amendment does not authorize a federal court to second guess their decisions nor is it our role to express our agreement or disagreement with their overall policies or theories of prison administration, as long as we find no constitutional violation. *See Hassine*, 846 F.2d at 175 (3d Cir.1988) (citing *Rummel v. Estelle*, 445 U.S. 263, 285, 100 S.Ct. 1133, 1145, 63 L.Ed.2d 382 (1980) (Stewart, J., concurring); *Di Buono*, 713 F.2d at 1001).

The district court found that a number of the thirty-two other states where the death penalty is in effect have instituted considerably less restrictive regimes for death-sentenced prisoners. The prisoners ask this Court to compare Pennsylvania's practices with those of other states, and on this basis, find Pennsylvania's practices constitutionally indefensible. Moreover, appellants contend that "[n]ot since the creation of the 'penitentiary' system in colonial Pennsylvania has any prison operated on as confined a regime as Pennsylvania's present death row," *Appellants' Brief* at 31, and they argue through historical analogy, that insanity, suicide, and death will follow from these practices. They argue further that already "lethargy, anger and physiological deterioration result directly from the Commonwealth's management policies," *Peterkin*, 661 F.Supp. at 922. These predictions are deeply disturbing to this Court, and we recognize that the Commonwealth's policies are comparatively restrictive, and in some respects harsh. We emphasize once more what is most crucial to our analysis: that on this record, appellants have established no more than "a theory that [the totality of conditions] inflicts pain." *Rhodes*, 452 U.S. at 349, 101 S.Ct. at 2400. Whatever may be the situation in a different case, the district court's findings of fact lend no support to appellants' claim of cruel and unusual punishment in this case.

We recognize, as the Supreme Court has documented, that many "courts have learned from repeated investigation and bitter experience that judicial intervention is *indispensable* if constitutional dictates— not to mention considerations of basic humanity—are to be observed in the prisons."

*Rhodes*, 452 U.S. at 354, 101 S.Ct. at 2403 (Brennan, J. concurring). Furthermore, we are in agreement with the Court of Appeals for the Second Circuit that "lengthy segregated confinement of the type considered [in this case], after an inordinate lapse of time, may necessitate periodic review to insure that conditions once constitutional have not become cruel and unusual." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984). For the purposes of this case, however, and carefully considering the Supreme Court's teaching that "the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society,'" *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)), we cannot conclude that the totality of the conditions on Pennsylvania's death rows constitute punishment "grossly disproportionate to the severity of the crime[s]." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

### III.  Access to the Courts

#### A.  *Facts and Procedural History*

We next turn to the appellants' claim that Commonwealth prison authorities deprive prisoners sentenced to death of their constitutional right of adequate, effective and meaningful access to the courts, as recognized by the Supreme Court in *Bounds v. Smith*, 430 U.S. 817, 821–23, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977), by prohibiting them from visiting the prison law library and denying them access to inmate law clinic workers. The relevant facts about Huntingdon and Graterford's policies concerning death-sentenced prisoners' access to the prison law library and prisoner legal clinic are not disputed. We emphasize here that since the facts found by the district court concern only death-sentenced prisoners, our opinion and conclusions are correspondingly applicable to this unique group.

Both Huntingdon and Graterford have a prison law library. Huntingdon's library is staffed by a head librarian, a library assist-

ant, and four civilian library aides, three of whom are called "legal reference aides." *Peterkin*, 661 F.Supp. at 920. "Legal reference aides are persons trained to assist inmates in locating legal reference materials." *Peterkin*, 661 F.Supp. at 920 n. 6. Graterford's law library is staffed by a head librarian and seven library assistants, five of whom are legal reference aides, who perform the same job as their Huntingdon counterparts. *Cf. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099, 1101 (E.D.Pa.), *aff'd*, 835 F.2d 285 (3d Cir.1987) (table), *cert. denied*, —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988) ("Library aides are not required to have training in legal research.") Inmates in the general populations of both prisons are permitted to visit the law libraries. Prison authorities have barred death sentenced prisoners from visits to the law libraries since Commissioner Marks's 1982 decision to place this group in administrative custody in the RHU's.

As a substitute for visits to the libraries, prison authorities have instituted what the district court called a "modified paging system," *Peterkin*, 661 F.Supp. at 921 n. 7, in order to make library materials available to capital prisoners. The Commonwealth provides them with an inventory of the library's legal and non-legal materials, which include legal forms. Tr. 6/26/86: 96, *Id.* at 920. A death sentenced inmate must complete a request slip, identifying his selection. With regard to the level of specificity a death row inmate's request must attain, the district court found that inmates may request "specific cases, reporters by volume, or materials on a general subject matter, such as habeas corpus." *Peterkin*, 661 F.Supp. at 920. Further, the district court found that legal reference aides "are not responsible for, and do not perform, legal research," *Peterkin*, 661 F.Supp. at 920 n. 6, and that "the library returns unintelligible slips for clarification." *Peterkin*, 661 F.Supp. at 920.

The request slips are collected by library staff members or RHU officers, who bring them to the libraries where the head librarians or a legal reference aide attempts to fill the request. Either a correctional officer or library staff member then delivers the requested materials to the inmates. At Huntingdon, deliveries are made three times a week. At Graterford, the head librarian visits the RHU at least once every two weeks, "in addition to the routine deliveries by her staff." *Peterkin*, 661 F.Supp. at 920. Huntingdon authorities permit a death-sentenced inmate to have three books at a time, while the library at Graterford places no restrictions on the number of books an inmate may have in his cell at one time. The library staff at both institutions prefers to give inmates copies of requested cases, thereby avoiding removing reporters from circulation. If the library provides a copy, an inmate may keep it for one month. If the prisoner can pay for photocopying, he may purchase his own copy. When a book does circulate, an inmate may keep it until another inmate requests it. *Peterkin*, 661 F.Supp. at 920.

Inmates in the general population at Graterford may consult directly with inmate staff members of the prison legal law clinic. Jt.App. at 156–157a. There is no record of a prison legal clinic at Huntingdon. The Commonwealth does not permit prisoners under sentence of death to consult with either "paralegals or 'jailhouse lawyers.'" *Peterkin*, 661 F.Supp. at 920.

With regard to the availability of counsel for death-sentenced prisoners, the findings of the district court and the record in this case are in some respects ambiguous. The district court found that, with the exception of one inmate, "all of the capital inmates have appointed counsel." *Peterkin*, 661 F.Supp. at 921. The district court does not specify, however, and the record does not reveal, for what kind of legal proceedings counsel have been appointed. On appeal, plaintiffs have conceded that "all of their members have counsel through [direct appeal]." Appellants' Reply Brief at 5, n *. The district court also found that "capital inmates were reasonably able to communicate with their attorneys by mail, visits, and telephone calls." *Peterkin*, 661 F.Supp. at 921.

In response to the prisoners' access to courts claim, the Commonwealth argued

below that (1) the decision to substitute the paging system for library visits and, at Graterford, to deny access to the prison legal clinic is compelled by security concerns unique to death row prisoners; (2) the system does enable death row prisoners to perform legal research and therefore provides constitutionally sufficient access to the courts; and (3) the fact that counsel have been appointed for all of the capital inmates precludes the inmates from complaining about the prison authorities' reliance on the paging system, since representation by counsel provides them with sufficient access to the courts.

The district court essentially adopted the Commonwealth's third argument. *Peterkin*, 661 F.Supp. at 928. It found as a factual matter that "the Commonwealth has demonstrated that all of the capital inmates have access to counsel," *Peterkin*, 661 F.Supp. at 928, citing in support of its finding Pa.R.Crim.P. 1503; 18 U.S.C.A. §§ 3005, 3006A (West 1985) (Criminal Justice Act provisions on appointment of counsel); *Guidelines for the Administration of the Criminal Justice Act, vol. VII, Guide to Judiciary Policies and Procedures,* ¶¶ 2.14(B) & 3.16 (March 1987) (allowing for compensation for legal assistance or consulting organizations in death penalty habeas corpus cases under Criminal Justice Act). *Peterkin*, 661 F.Supp. at 921. Reasoning that "[t]he constitutional right of access does not mandate access to a library for post-conviction motions where other adequate outside legal assistance is available," *Peterkin*, 661 F.Supp. at 928, the district court held that since the Commonwealth has demonstrated that all the death-sentenced prisoners have access to counsel, the record does not support the prisoners' claim that their right of access to the courts has been violated. *See Peterkin*, 661 F.Supp. at 918.

On appeal, the plaintiffs argue that the factual finding that all of the members of their class have counsel, at least for certain purposes, does not by itself support dismissal of their access to courts claim. They concede that all the class members have counsel through direct appeal. But death-sentenced prisoners, they contend, are also

entitled to adequate access to the courts in the following three situations: (1) at the pleading stage of post-conviction appeals, whether these take the form of habeas corpus petitions or petitions under Pennsylvania's Post Conviction Hearing Act, Chapter 1500, Pa.R.Crim.P., 42 Pa.Cons.Stat. Ann. (Purdon 1986); (2) for the purpose of filing civil rights actions under 42 U.S.C. § 1983; and (3) when an inmate exercises the constitutional right of self-representation, *see Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). With respect to post-conviction appeals, they argue that the district court's reliance on Pa.R.Crim. 1503 is erroneous because this rule on its face does not grant a prisoner under sentence of death assistance of counsel at the *pleading* stage of a post-conviction appeal, but rather provides for the appointment of counsel only *after* members of appellants' class who are without counsel prepare and file specific post-conviction papers. Before this stage, appellants contend, death sentenced prisoners are not provided with counsel, because appointment of trial counsel expires with the exhaustion of direct appellate review. Appellants reassert their argument that in the absence of counsel during these three situations, the constitutional right of access to the courts is not satisfied by the Commonwealth's paging system, and that the Commonwealth must therefore provide more legal assistance, whether this takes the form of visits to the law library, consultation with legal clinic workers, or some other form or combined forms of legal assistance.

The Commonwealth argues to this Court that "the trial court found that each plaintiff who had testified had an attorney throughout his stay in the RHU," Appellees' Brief at 43, and that this finding defeats the prisoners' claim that they have been constitutionally deprived by exclusive dependence on the paging system. As an alternative ground for affirmance, the Commonwealth continues to assert that it has discharged its obligations under *Bounds* by providing death-sentenced inmates "with meaningful access to a law

library at all times while confined in the RHU," Appellees' Brief at 46. Thus, even if the plaintiffs' could demonstrate that some capital prisoners do not have counsel at the pleading stage of post-conviction appeals or habeas corpus petitions or for the filing of civil rights claims under 42 U.S.C. § 1983, the Commonwealth argues that the paging system provides death row inmates with constitutionally sufficient access to the courts.

## B. *Bounds v. Smith*

The central case on the constitutional right of access to courts in the prison context is *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Plaintiffs, prisoners in North Carolina correctional facilities, brought what ultimately became a single, consolidated action under 42 U.S.C. § 1983, in which they alleged that they were denied access to the courts in violation of their fourteenth amendment rights by the state's failure to provide legal research facilities.[18] The district court granted the plaintiffs' motion for summary judgment on that claim, holding that *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (per curiam),[19] was vio-

lated where "there was 'no indication of any assistance at the initial stage of preparation of writs and petitions.'" *Bounds v. Smith,* 430 U.S. at 818, 97 S.Ct. at 1493. The district court in *Bounds* found the sole prison library in the state to be "severely inadequate." *Id.* at 818, 97 S.Ct. at 1493. It charged the State Department of Corrections with devising a constitutionally sound program to assure inmates access to the courts. Leaving to the state the choice of "what alternative would 'most easily and economically' fulfill this duty," the district court suggested that "a program to make available lawyers, law students, or public defenders might serve the purpose at least as well as the provision of law libraries." *Id.* at 819, 97 S.Ct. at 1493.

The state opted for libraries in conjunction with an inmate self-help training program. It presented the district court with a plan to establish libraries in some but not all of its correctional institutions. In addition, the state proposed to set up a smaller library in the central prison segregation unit. *Id.* at 819, 97 S.Ct. at 1493. It specified the books, office machines, and supplies with which the libraries would be equipped and proposed to train inmates as

**18.** The district court, as well as plaintiffs, locate the source of the right of access to the courts in the sixth amendment. *See Peterkin,* 661 F.Supp. at 927. While the sixth amendment's right to counsel and the right of access to the courts are certainly related rights, the Supreme Court in *Bounds* stated only that the basis of the plaintiffs' claim in that case was the fourteenth amendment, without explicitly discussing the constitutional right of access to the courts. *See Bounds,* 430 U.S. at 818, 97 S.Ct. at 1493. *See also Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987) (referring to the equal protection guarantee of meaningful access to the courts); *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974) ("The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violation of their constitutional rights."); *Ex parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (state may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus). *Jackson v. Procunier,* 789 F.2d 307 (5th Cir.1986) (access to courts is protected by fourteenth amendment guarantees of procedural and substantive due process as well as the

first amendment right to petition for redress of grievances); *Nordgren v. Milliken,* 762 F.2d 851 (10th Cir.1985) (access to the courts a privilege and immunity accorded citizens under article four and the fourteenth amendment, part of the right to petition under the first amendment and the due process clause).

Where a prisoner alleged that he was retaliated against for filing a civil rights complaint against prison officials, we held that the right of access implicates the first amendment's petition clause. See *Milhouse v. Carlson,* 652 F.2d 371, 373 (3d Cir.1981) ("[P]ersons in prison, like other individuals, have the right to petition the government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'").

**19.** In *Younger,* the Court affirmed the judgment of the district court in *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Ca.1970) (per curiam) in light of *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The *Gilmore* court held that California's regulation excluding state and federal reports and annotated codes from its prison law libraries violated the prisoners' constitutional right of reasonable access to courts. *See Gilmore,* 319 F.Supp. at 111–12.

research assistants and typists to aid fellow prisoners. *Id.* at 820, 97 S.Ct. at 1494. Inmates at facilities without libraries would be transported to and housed in facilities with libraries, "if necessary, for a full day's library work." *Id.* at 819, 97 S.Ct. at 1493.

Before rendering its final decision on the plan, the district court ordered further briefing "on whether the state was required to provide independent legal advisors for inmates in addition to library facilities." *Id.* at 820, 97 S.Ct. at 1494. Thereafter, the district court approved the plan in most of its details. It held that the plan was sufficient to give inmates reasonable access to the courts, and that, based on the Supreme Court's decision in *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), the state need not in addition furnish attorneys to bring habeas corpus and civil rights actions for prisoners. *Id.* 430 U.S. at 820–21, 97 S.Ct. at 1494. After the district court approved the plan, the state applied to the Federal Law Enforcement Assistance Administration (LEAA) for funds to set up the libraries and train a librarian and inmate clerks. *Id.* at 821, 97 S.Ct. at 1494. Both sides appealed from aspects of the district court's order. The Fourth Circuit affirmed in all respects that concern us here, and the state petitioned the Supreme Court for review.

The Supreme Court affirmed, holding "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. The right of access " 'assure[s]' the indigent defendant an adequate opportunity to present his claims fairly.' " *Bounds*, 430 U.S. at 823, 97 S.Ct. at 1495 (quoting *Ross v. Moffitt*, 417 U.S. at 616, 94 S.Ct. at 2447). "The inquiry," the Court directed, "is ... whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430

U.S. at 825, 97 S.Ct. at 1496. "[T]he touchstone," the Court stated, is " 'meaningful access' to the courts." *Bounds*, 430 U.S. at 823, 97 S.Ct. at 1495 (quoting *Ross v. Moffitt*, 417 U.S. at 611, 612, 615, 94 S.Ct. at 2444, 2445, 2446).

The *Bounds* Court emphasized that legal assistance for prisoners is particularly important in the context of discretionary appeals, collateral attacks and civil rights actions. It stated:

> [I]n this case, we are concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights. Rather than presenting claims that have been passed on by two courts, they frequently raise heretofore unlitigated issues. As this Court has 'constantly emphasized,' habeas corpus and civil rights actions are of 'fundamental importance ... in our constitutional scheme' because they directly protect our most valued rights. *Johnson v. Avery*, 393 U.S. at 485 [89 S.Ct. at 748]; *Wolff v. McDonnell*, 418 U.S. [539] at 579 [94 S.Ct. 2963, 2986, 41 L.Ed.2d 935]. While applications for discretionary review need only apprise an appellate court of a case's possible relevance to the development of the law, the prisoner petitions here are the first line of defense against constitutional violations. The need for new legal research or advice to make a meaningful initial presentation to a trial court in such a case is far greater than is required to file an adequate petition for discretionary review.

*Bounds*, 430 U.S. at 827–28, 97 S.Ct. at 1498. The Court explained its rationale at some length.

> Although it is essentially true ... that a habeas corpus petition or civil rights complaint need only set forth facts giving rise to the cause of action ... it hardly follows that a law library or other legal assistance is not essential to frame such documents. It would verge on incompetence for a lawyer to file an initial pleading without researching such issues as jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff

and defendant, and types of relief available. Most importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action.

If a lawyer must perform such preliminary research, it is no less vital for a *pro se* prisoner. (footnote omitted) Indeed ... it is often more important that a prisoner complaint set forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing *in forma pauperis* and may dismiss the case if it is deemed frivolous. *Bounds,* 430 U.S. at 825–26, 97 S.Ct. at 1496–97.

A prisoner's constitutional right of access to the courts is undiminished when that prisoner is held in a segregated unit. *See Valentine v. Beyer,* 850 F.2d 951, 955 (3d Cir.1988) (alternative means of providing legal assistance for those in close confinement must be of at least equal caliber); *Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1104 (E.D.Pa.), *aff'd,* 835 F.2d 285 (3d Cir.1987) (table), *cert. denied,* — U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988). (paging system by itself inadequate access to the library and the courts for illiterate inmates and inmates in administrative or disciplinary custody).[20] There is also no diminution of this fundamental right where the prisoners separately incarcerated are under a death sentence.[21] The difficult task in cases where prisoners' right of access is at issue in a particular prison is to determine whether the mix of legal resources the state and prison authorities propose to provide is sufficient to discharge constitutional obligations while also enabling them to meet their critical responsibility of ensuring internal order and institutional security. *See O'Lone v. Shabazz,* — U.S. ——, 107 S.Ct. 2400, 2404–07, 96 L.Ed.2d 282 (1987); *Turner v. Safley,* — U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). Because we hold that further factual findings are necessary in order to determine to what degree counsel is available for death-sentenced prisoners in the Commonwealth, we do not address the sufficiency of the paging system as the sole means of legal assistance for death-sentenced prisoners.[22]

---

**20.** In response to *Bounds,* prisons have instituted a variety of means of providing legal assistance to prisoners in segregated units. Where law libraries are provided, no case holds that a state fulfills its obligation to provide an adequate law library under regulations that deny control unit prisoners any access to a library. *See e.g., Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986) (legal assistance under lockdown providing for main law library paging system supplemented by smaller direct access to basic law library sufficient if District of Columbia caselaw available for prisoner who needs it); *Campbell v. Miller,* 787 F.2d 217 (7th Cir.1986) (main library paging system and Control Unit library at U.S. Penitentiary at Marion); *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 858 (9th Cir.1985) (existence of an adequate law library does not provide for meaningful access to the courts if the inmates are not allowed a reasonable amount of time to use the library); *Harrington v. Holshouser,* 741 F.2d 66 (4th Cir. 1984) (access for inmates in disciplinary segregation in North Carolina constitutionally sufficient where prisoners transported to libraries), *but see Smith v. Bounds,* 813 F.2d 1299 (4th Cir.1987) (because North Carolina not in compliance with its constitutional obligations, district court properly ordered remedy of attorney assistance).

**21.** At least one court has determined that for purposes of all state post-conviction proceedings involving a challenge to the death penalty, the right of meaningful access to the courts cannot be assured without the mandatory appointment of counsel. *See Giarratano v. Murray,* 847 F.2d 1118 (4th Cir.1988) (en banc).

**22.** We note, however, that we have recently rejected a plan in Trenton State Prison proposing reduced paralegal assistance for prisoners in close custody limited to a library paging system. *See Valentine v. Beyer,* 850 F.2d 951 (3d Cir. 1988), *see also Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099 (E.D.Pa.), *aff'd,* 835 F.2d 285 (3d Cir.1987) (table), *cert. denied,* — U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988).

Paging systems similar to the one established by the Commonwealth, as the sole legal assistance furnished to inmates, have been rejected consistently by other courts of appeals. *See e.g., Corgain v. Miller,* 708 F.2d 1241, 1250 (7th Cir. 1983) ("catch–22" paging system); *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985) (weekly bookmobile checkout system, accompanied by circumscribed assistance from law students); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986) (twice weekly requests of two specific volumes from county law library; virtually all inmates have had legal representation in their criminal

## C. *Analyzing Access to Courts Claims*

In the case before us, the district court inferred from this Court's precedents that in order to make out a successful *Bounds* claim, the death-sentenced prisoners must demonstrate that they have suffered an actual injury, and concluded that, because the prisoners each have counsel, actual injury cannot be shown. We will first examine the question of the actual injury in the context of access to courts claims, then address the district court's factual findings in this case.

With respect to claims involving state policies or prison rules relating to matters other than use of the prison law library and legal clinics and the availability of attorneys, this Court has applied *Bounds* in two instances. In the first of these, *Kershner v. Muzurkiewicz*, 670 F.2d 440 (3d Cir.1982) (in banc), an appeal from a denial of a preliminary injunction, the issue was "whether the district court erred in denying a preliminary injunction that would have required the Commonwealth to supply, without cost to the named plaintiffs, pads, pens, pencils, postage, photocopying and other legal materials when the plaintiffs had funds in their institutional accounts sufficient to purchase those items." *Kershner*, 670 F.2d at 442. This Court viewed the issues before it as peripheral to those raised in *Bounds*. We said that "at this stage in the litigation, there has been no showing that this proceeding involves 'access to the courts.'" *Kershner*, 670 F.2d at 444. "Pads, pens, pencils, and photocopy machines," the Court said, "are of course, neither 'law libraries' nor 'alternative sources of legal knowledge.'" *Kersh-*

*ner*, 670 F.2d at 444. The Court found that "the appellants did not establish that there was any instance in which they were unable to pursue any legal action because of the cost of legal supplies and photocopying. Rather, they assert that in being required to use their own limited funds they have been or will be deprived of unspecified prison amenities." *Kershner*, 670 F.2d at 442. For these reasons, the Court agreed that appellants had not met their burden at the preliminary injunction stage of showing irreparable injury. *See Kershner*, 670 F.2d at 444–45. *Cf. Valentine v. Beyer*, 850 F.2d 951, 957–58 (3d Cir.1988) (preliminary injunction burden of irreparable injury in access to prison legal assistance shown where some inmates unable to comply with court filing deadlines).

Following *Kershner*, we established in *Hudson v. Robinson*, 678 F.2d 462 (3d Cir. 1982), that "it must first be shown that the proceeding involves access to the courts, *Kershner*, 670 F.2d at 444, and that some actual injury, that is, an 'instance in which an inmate was actually denied access to the courts,' *id.*, has occurred." *Hudson*, 678 F.2d at 466. We held that there was no such showing because "[t]he only 'injury' suffered by plaintiff was his being required on one occasion to wait ten days to have a document notarized." *Hudson*, 678 F.2d at 466. "While a prison must normally make notary services available to its inmates (citation omitted) it does not necessarily follow that the failure to provide such services constitutes a denial of access to the courts." *Hudson*, 678 F.2d at 466 n. 5. We specifically distinguished the claim before us from that in *Bounds*, noting that

as well as civil proceeding); *Toussaint v. McCarthy*, 801 F.2d 1080, 1108–10 (9th Cir.1986) (paging system) (citing cases holding that prison authorities must provide research assistance for all prisoners denied physical access to law libraries). In *Williams v. Leeke*, 584 F.2d 1336 (7th Cir.1978), *cert. denied*, 441 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979), the court stated:
Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds*. Simply providing a prisoner with books in his cell, if he requests them, gives a prisoner no meaningful chance to explore the legal remedies

that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.
*Id.* at 1339.

"[p]laintiff does not complain that the library itself is inadequate, or that the legal material provided is insufficient in any way." *Hudson*, 678 F.2d at 465.[23]

The district court assumed, without explicit analysis, that the plaintiffs' complaint in this case directly implicates the right of access to the courts. We agree. In their complaint, the prisoners alleged:

79. The limitations placed on plaintiffs by defendants on access to legal books and law clinic workers denies plaintiffs access to the courts in violation of the Sixth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

Jt.App. at 23a. This class action lawsuit directly challenges the Commonwealth's system of providing legal materials to capital inmates, its paging system, the death row prisoners' lack of access to the prison legal clinic, and the availability of counsel to class members. We note that *Bounds* itself concerned the constitutional adequacy of a prison legal assistance program consisting of libraries (including a separate library in the prison system's segregation unit), arrangements for inmate library visits, and the use of trained inmates as research assistants and typists. Thus, unlike *Kershner*, which concerned "pads, pens, pencils and photocopy machines," *Kershner*, 670 F.2d at 444, and *Hudson*, which dealt with notary services, noise levels in the library, pen and paper supplies and scheduling adjustments, *Hudson*, 678 F.2d at 465, this case directly concerns prisoner access to "law libraries" and "alternate sources of legal knowledge." *See Valen-*

tine, 850 F.2d at 952 (challenge to the adequacy of Trenton State Prison's legal assistance program).

The question that has yet not been resolved is what actual injury showing is required where, as here, an access to courts claim directly implicates the core *Bounds* issue—whether the legal materials or assistance available to prisoners are sufficient to vindicate the right of access to the courts—and we review the case following a trial rather than at the preliminary injunction stage. The district court, holding that a showing of an instance in which an inmate was actually denied access to the courts, *Peterkin*, 661 F.Supp. at 927, was required in this case, concluded that the plaintiff class has "not shown that they suffered an actual injury. Rather, the Commonwealth has demonstrated that all of the capital inmates have access to counsel." *Peterkin*, 661 F.Supp. 927, 928.[24] The district court also stated that under *Bounds*, an inmate's right of access to the courts does not require the Commonwealth to provide direct access to a prison law library as long as the state provides " 'adequate assistance from persons trained in the law,' " *Peterkin*, 661 F.Supp. at 928 (quoting *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498), and that where the state provides adequate outside legal assistance, prison authorities may also prohibit capital inmates from securing legal assistance either from other inmates or from paraprofessionals. *Peterkin*, 661 F.Supp. at 928, (citing *Gometz v. Henman*, 807 F.2d 113, 116 (7th Cir.1987) and *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)). Thus, although the district court rested its

---

**23.** As we stated in *Hudson*, however, "[i]t is possible that a combination of several factors might, taken together, lead to a finding that a prisoner has been denied access to the courts, where no one of the factors taken alone, would do so." *Hudson*, 678 F.2d at 466.

**24.** The district court did not have the benefit of a published opinion of this Court applying the actual injury requirement to cases dealing with the sufficiency of legal assistance rather than ancillary items. It relied on an unpublished opinion of this Court in which we affirmed the dismissal of a *pro se* prisoner's complaint of denial of access to the courts. *Cole v. Fulcomer*, No. 86–5246 (3d Cir. Dec. 3, 1986) (unpublished

memorandum opinion), see *Cole v. Fulcomer*, 808 F.2d 1515 (3d Cir.1986) (table). Relying on *Kershner*, the *Cole* panel stated that dismissal was required, because Cole did not allege that the law library provided to him was inadequate, or that he suffered any actual injury either because prison policies precluded him from receiving any legal assistance or because an avenue of relief was permanently foreclosed to him. Cole is distinguishable from this case, where the plaintiff-class does allege in its complaint that, "[t]he limitations placed on plaintiffs by defendants on access to legal books and law clinic workers den[y] plaintiffs access to the courts." Jt.App. at 23a.

holding on the plaintiff-class's failure to demonstrate an actual injury, its conclusion is twofold; it also assumes that since all members of the plaintiff-class are assisted by counsel, *Bounds* itself is satisfied, and the adequacy of the paging system in the absence of counsel need not be addressed. *See Peterkin,* 661 F.Supp. at 928 (comparing *PPLC*).

In *Kershner* and *Hudson,* we applied an actual injury requirement as a consequence of our view that not every item or feature capable of being linked to a state's provision of legal assistance to prisoners automatically implicates the constitutional right of access to the courts. Some ancillary features, such as the scheduling of available notary services, *see Hudson,* 678 F.2d at 466, may affect merely comfort or convenience without depriving a prisoner of access to the courts. A court cannot make the assumption that any alleged administrative deficiency or less than optimal clerical arrangement actually impedes a prisoner's ability to file meaningful legal papers.

In cases where a prisoner's claim relates to access to resources other than legal assistance itself, an actual injury test can be helpful in determining whether an unconstitutional abridgment of access to the courts has occurred. Legal assistance, by contrast—whether in the form of an accessible and adequate law library, court-appointed or other attorneys or para-professionals, or some combination of legal resources—is central, not peripheral, to the right of access to the courts that *Bounds* protects. We believe that in cases, like this case, directly involving prisoners' access to legal knowledge, an actual injury necessarily occurs by virtue of a prison's failure to provide the level of assistance required under *Bounds.* We hold, therefore, that where, as here, plaintiffs who possess standing to sue [25] bring an access to the courts claim that alleges the inadequacy of "law libraries or alternative sources of legal knowledge," *Kershner,* 670 F.2d at 444, the analysis of whether an actual constitutional injury exists is simply the *Bounds* analysis.[26] This reading of our actual inju-

**25.** We note that the plaintiffs' demonstration of actual injury or an instance of actual denial of access to the courts is not a standing requirement. See *Hudson* at 466 (absent evidence that any inmates were denied access to the courts discussion of standing is unnecessary). The district court correctly found that the plaintiff-class, all prisoners under sentence of death in the Commonwealth of Pennsylvania, have standing to challenge the conditions of their confinement and the Commonwealth's programs, policies and practices determining their access to the courts. The plaintiff-class clearly met the actual or threat of actual injury requirements inherent in applicable standing law. See generally, *Frissell v. Rizzo,* 597 F.2d 840 (3d Cir.1979), cert. denied, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979) (whether a litigant has standing not dependent on the merits of litigant's contentions, but on sufficiency of litigant's concern with subject matter, and exposure to actual or threatened injury); *Borelli v. City of Reading,* 532 F.2d 950 (3d Cir.1976) (question of standing generally determined from face of the complaint).

**26.** This Court has repeatedly analyzed access to courts and legal assistance claims without reference to an actual injury showing. *United States v. Grimes,* 641 F.2d 96, 98 (3d Cir.1981), we found no abuse of discretion in the district court's failure to grant a hearing on the defendant's claim that he was denied adequate access to legal materials to prepare as a *pro se* litigant

for trial. The Court found that the claim was fully addressed by the district court, which had done everything within reason to insure that the defendant had access to the lawbooks that were necessary for the preparation of his defense. In *Rhodes v. Robinson,* 612 F.2d 766 (3d Cir.1979), a pre-*Bounds* case, we relied on *Wolff v. McDonnell,* 418 U.S. 539, 577–80, 94 S.Ct. 2963, 2985–86, 41 L.Ed.2d 935 (1974) and *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968), to reverse the denial of standing to an inmate law library clerk at the State Correctional Institution at Huntingdon who sought to overturn a prison rule prohibiting him from assisting other prisoners in the preparation of their legal materials while on duty. In explanation of the recognition of Rhodes's standing, the Court stated:

> We can take notice of the fact that many prisoners are unable to prepare legal materials and file suits without assistance. The record contains some examples of Rhodes having provided the assistance required by a few such prisoners. The challenged restriction, therefore, might materially impair the ability of some prisoners to file civil rights actions. Suits by these prisoners to protect their own rights of access to the courts would be difficult because, as alleged, they would require the assistance of someone like Rhodes to bring such a suit.

*Rhodes,* 612 F.2d at 769. In *Bryan v. Werner,* 516 F.2d 233, 236–39 (3d Cir.1975), we held that

ry requirement is supported not only by *Kershner* and *Hudson,* which as we have seen distinguish ancillary matters from those directly at issue in *Bounds,* but also by *Bounds* itself, where the Court's sole inquiry was whether the legal assistance provided was sufficient to afford prisoners meaningful access to the courts.

### D. *Availability of Counsel*

We must next determine whether the prisoners' right of access to the courts has been satisfied, as the district court found, by the provision of lawyers to all capital prisoners. We read *Bounds* to hold that the provision of lawyers is one means by which a state may provide prisoners with meaningful access to courts. "Among the alternatives" the Court said,

> are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.

*Bounds,* 430 U.S. at 831, 97 S.Ct. at 1499.[27]

The Court made it clear, however, that if a state relies exclusively on some degree of assistance from lawyers to provide prisoners with access to the courts, that assistance must be available for all relevant legal proceedings. The Supreme Court in *Bounds* left no doubt that a court taking

the constitutional measure of a state's policies and practices determining prisoners' access to the courts must explicitly consider what assistance is available to inmates for the purpose of preparing and filing discretionary appeals, petitions for writs of habeas corpus or under the Post–Conviction Relief Act, and civil rights actions. *See Bounds,* 430 U.S. at 825–28, 97 S.Ct. at 1496–98.[28] *See also Jackson v. Procunier,* 789 F.2d 307 (5th Cir.1986).

The Supreme Court has not addressed whether, as argued by the prisoners, where a prisoner exercises his or her right of self-representation under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the state is obligated to provide the legal assistance specified in *Bounds* in order to ensure that prisoner's access to the courts. A few courts have held that the sixth amendment right to self-representation does not imply the concommitant right of a person exercising that option to adequate law libraries. *See, United States ex rel. George v. Lane,* 718 F.2d 226 (7th Cir.1983); *United States v. Wilson,* 690 F.2d 1267 (9th Cir.1982); *United States v. Chatman,* 584 F.2d 1358 (4th Cir.1978). The Supreme Court's decision in *Faretta* relies heavily on a close textual reading of the sixth amendment, 422 U.S. at 818–21, 95 S.Ct. at 2532–34, and an examination of its historical background. *Id.* at 821–33, 95 S.Ct. at 2534–40. *Faretta* speaks only to the existence of a right to represent oneself at trial without assistance of counsel. It does not address the practical or constitutional ramifications of

some prison restrictions on the use of a law clinic might impede access to courts and were therefore invalid. *See also Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099 (E.D.Pa. 1987); *aff;d* 835 F.2d 285 (3d Cir.1987) (table); *Benjamin v. Potter,* 635 F.Supp. 243 (D.V.I. 1986), *aff'd* 838 F.2d 1205 (3d Cir.1988) (table).

**27.** Even where a state provides prison libraries and permits inmate legal assistance, and where the prisoners in question are actually represented by lawyers, *Bounds* indicates that a prison regulation affecting access to the courts may be found to impermissibly burden the right. *See Bounds,* 530 U.S. 824 n. 11, 97 S.Ct. at 1496 n. 11 (citing *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974))

(invalidating California regulation barring from prisons law students and para-professionals employed by lawyers representing prisoners, where prisons have law libraries and permit inmate legal assistance).

**28.** Recent amendments to the waiver provisions in Pennsylvania's post-conviction relief statute, 42 Pa.Cons.Stat.Ann. § 9544 (Purdon 1988), require a petitioner to raise all issues that can be raised in prior proceedings in order to avoid waiving them. Federal courts generally may not consider claims barred by an independent and adequate state procedural rule. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

allowing a person who is prevented from using a prison law library to proceed *pro se.*

By contrast, *Bounds* draws from multiple constitutional sources the right of access to the courts and a prisoner's constitutional right to adequate law libraries or to adequate legal assistance. *See* note 27 *supra* at 1042. While a sixth amendment *Faretta* right may not necessarily encompass the right defined by *Bounds, see Chatman,* 584 F.2d at 1360, this case presented the district court with the reverse question: does the state's obligation to provide prisoners with adequate law libraries or adequate legal assistance in order to ensure access to the courts extend to those prisoners who have exercised their right to self-representation pursuant to *Faretta?* This is not a question that was answered by the *Wilson* or *Chatman* holdings.[29]

In this case, some uncertainty persists regarding the status of Ronald Wheeler, the only named plaintiff who exercised the right of self-representation during a portion of his direct appeal. *See Peterkin,* 661 F.Supp. at 921. At the time of this writing it appears that Wheeler has accepted the representation of appointed counsel for his direct appeal. *See* Appellants' Reply Brief at 5 n. *. For this reason, we conclude that we need not reach the issue raised by the prisoners concerning the interplay between *Faretta* and *Bounds.*

As to prisoners other than Wheeler, we find that the district court's factual finding concerning the availability of counsel to death row prisoners is ambiguous with respect to the proceedings for which capital inmates have counsel. The district court found, and it is agreed by both sides on appeal, that all the class members (including Wheeler) currently have counsel, but we are unable to determine from the district court's opinion whether capital prisoners have had or will have counsel as needed for the purpose of preparing habeas corpus petitions or filing civil rights actions, as required by *Bounds.*

The district court appears to predicate its finding that death-sentenced prisoners have counsel in part on a rule promulgated by the Pennsylvania Supreme Court, Pa.R. Crim.P. 1503 (Purdon Supp.1986).[30] *Peterkin,* 661 F.Supp. at 921. This rule provides that counsel for indigent defendants be appointed by the court on its own motion "whenever the interests of justice require it," and that the appointment will be effective "until final judgment, including any proceedings upon appeal from a denial of collateral relief." Pa.R.Crim.P. 1503. On its face, Rule 1503 does not require a court to appoint counsel to assist prisoners at the pleading stage of the preparation of petitions filed pursuant to the Post–Conviction Hearing Act, 42 Pa.Con.Stat. § 9541 *et seq.* (1986),[31] or in any aspect of federal habeas

---

**29.** We note that the *Bounds* Court rejected the argument that since the right to counsel did not extend to discretionary appeals the right to access to the courts also did not extend that far. *See Bounds,* 430 U.S. at 827, 97 S.Ct. at 1497. Certainly if the state's obligation to provide adequate law libraries or adequate assistance from persons trained in the law extends to those prisoners engaged in discretionary appeals, it must extend to those who are pursuing their direct appeals, albeit without counsel.

**30.** This rule provides:
   **Rule 1503. Appointment of Counsel**
   (a) Except as provided by Rule 1504, when an unrepresented petitioner satisfies the court that he is unable to procure counsel, the court *shall* appointment counsel to represent him. The court, on its own motion, *shall* appoint counsel to represent a petitioner *whenever* the interests of justice require it.
   (b) Where counsel has been appointed, such appointment shall be effective until final

judgment, including any proceedings upon appeal from a denial of collateral relief.
**Pa.R.Crim.P.** 1503 (Purdon's Supp.1988) (emphasis added).

**31.** The Pennsylvania legislature has recently amended this Act and retitled it the Post–Conviction Relief Act (PCRA). *See* Purdon's Pennsylvania Legislative Service, #3, June 1988. In doing so, it repealed 42 Pa.Cons.Stat. § 9551(b), which provided for appointment of counsel as follows:
   **§ 9551. Pauper petitions**
   (a) **General rule.**—If the petition alleges that the petitioner is unable to pay the costs of the proceeding, the court may order that the petitioner be permitted to proceed as a poor person and order a transcript of the proceedings delivered to the petitioner.
   (b) **Appointment of counsel.**—If the petitioner is without counsel and alleges that he is without means to procure counsel, he shall

corpus or state or federal civil rights actions.[32] Although the Pennsylvania Supreme Court has not foreclosed appointment of counsel under Rule 1503 for second or successive petition, *Commonwealth v. Finley*, 497 Pa. 332, 440 A.2d 1183 (1981), it interprets this rule to mandate appointment of counsel only in a first post-conviction petition. *Commonwealth v. McClinton*, 488 Pa. 598, 413 A.2d 386 (1980). Indeed, the Supreme Court recently held that Pennsylvania's post-conviction statute does not create a due process requirement that appointed counsel in collateral proceedings comply with the procedural requirements of *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) when seeking to withdraw from representation without filing a brief. *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987).

The Court in *Bounds* specifically rejected an argument against a claim of insufficient access to courts based on a state post-conviction statute similar to the one on which the district court relies here. It stated:

> Since our main concern here is 'protecting the ability of an inmate *to prepare* a petition or complaint,' (citation omitted) it is irrelevant that North Carolina authorizes the expenditure of funds for ap-

pointment of counsel in some state post-conviction iproceedings for prisoners whose claims survive initial review by the courts (citation omitted). Moreover, this statute does not cover appointment of counsel in federal habeas corpus or state or federal civil rights actions, all of which are encompassed by the right of access.

*Bounds*, 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17. (emphasis added). *Accord Campbell v. Miller*, 787 F.2d 217, 229–30 (7th Cir.1986); *Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir.1985); *Penland v. Warren County Jail*, 759 F.2d 524, 532 (6th Cir.1985); *Bonner v. City of Prichard Alabama*, 661 F.2d 1206, 1212 (11th Cir. 1981) (en banc).

The district court also appears to have based its finding that all of the capital inmates have counsel in part on 18 U.S.C. §§ 3005 and 3006A (1985), the Criminal Justice Act, and its companion *Guidelines for the Administration of the Criminal Justice Act, vol. VII, Guide to Judiciary Policies and Procedures*, ¶¶ 2.14(B) and 3.16 (1987) ("the Guidelines"). *Peterkin*, 661 F.Supp. 895, 921.

18 U.S.C. § 3005 provides for representation in *federal* capital cases and is therefore irrelevant to this case.[33] 18 U.S.C.

---

state whether or not he wishes counsel to be appointed to represent him. If appointment of counsel is so requested and the court is of the opinion that a hearing on the petition is required, the court shall appoint counsel if satisfied that the petitioner has no means to procure counsel. The appointment of counsel shall not be required if the petitioner's claim is patently frivolous and without trace of support in the record as provided by section 9549 (relating to hearing on petition).

42 Pa.Cons.Stat. § 9551. Even before the repeal of this provision, it was to be read in conjunction with the rules of criminal procedure promulgated by the Pennsylvania Supreme Court. *See* **Pa.R.Crim.P.** 1507. Since Pa.R.Crim.P. 1503 is unaffected by the statutory amendment, our analysis of the availability of counsel to Commonwealth prisoners under Pennsylvania law remains unchanged.

**32.** By focusing on what Pa.R.Crim.P. 1503 does not provide, we do not mean to belittle its contribution to criminal justice. By providing indigent prisoners a statutory right to appointed counsel for at least one phase of state post-conviction proceedings, the Commonwealth extends

critical legal assistance to its prisoners. In *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Supreme Court stated that because Pennsylvania was not constitutionally required to appoint counsel for post-conviction proceedings, the due process clause does not require that the counsel comply with the procedures set forth in *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) for withdrawing from appointed representation. *Id.* 107 S.Ct. at 1993. *Finley*, however, was not a death penalty case and did not address *Bounds* or the right of meaningful access to the courts. *See Giarratano*, 847 F.2d 1118, 1121–22 (4th Cir.1988) (en banc). In the absence of appointed counsel, a state must under *Bounds* preserve access to the courts for prisoners by means of reasonable access to law libraries or some other form of legal assistance.

**33.** This provision states:
§ 3005. **Counsel and witnesses in capital cases**
    Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel learned in the law; and

§ 3006A and its accompanying Guideline, ¶ 2.14, permit *discretionary* appointment of counsel, in the interest of justice, at any stage of habeas proceedings (including federal review of state capital convictions), from state and local, as well as federal, defender organizations.[34] The district court further relied on Paragraph 3.16 of the Guidelines which elaborates on that provision of the Criminal Justice Act providing for services other than counsel. 18 U.S.C. § 3006A(e).[35] This Guideline

> authorizes the reasonable employment and compensation of public and private organizations ... which provide consulting services to appointed and *pro bono* lawyers in capital federal habeas corpus cases in such areas as records completion, exhaustion of state remedies, identification of issues, review of draft pleadings and briefs, etc.

Guidelines ¶ 3.16.

These federal provisions hold out the possibility to a capital prisoner that a court to which he submits a habeas or PCRA petition may see fit to appoint lawyers and consultants, such as expert witnesses, to assist these lawyers, once lawyers are al-

---

the court before which he is tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire, who shall have free access to him at all reasonable hours. He shall be allowed in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

18 U.S.C. § 3005 (1986).

**34.** This statute provides in pertinent part:

(b) **Appointment of counsel.** Counsel furnishing representation under the plan shall be selected from a panel of attorneys designated or approved by the court, or from a bar association, legal aid agency, or defender organization furnishing representation pursuant to the plan.

(g) **Discretionary appointments.** Any person subject to revocation of parole, in custody as a material witness, or seeking relief under section 2241, 2254, or 2255 of title 28 [28 U.S.C. §§ 2241, 2254 or 2255] or section 2245 of Title 18 [18 U.S.C. § 4245] *may* be furnished representation pursuant to the plan *whenever the United States magistrate or the court determines* that the interests of justice so require and such person is financially unable to obtain representation. Payment for such representation may be provided in subsections (d) and (e).

18 U.S.C. § 3006A(b), (g) (1986) (emphasis added).

The accompanying Guideline provides:

B. *Appointment of Counsel in Death Penalty Cases.* In the event that counsel is appointed for a person who has been sentenced to death by a state court and is seeking relief pursuant to 28 U.S.C. § 2254, the judicial officer *may* appoint and compensate under the Criminal Justice Act an attorney furnished by a state or local public defender organization or by a legal aid agency or other private, non-profit organization to represent the person. Such appointments may be in place of, or in addition to, the appointment of a federal defender organization or a CJA panel attorney or an attorney appointed *pro hac vice* in accordance with paragraph 2.01 of the *CJA Guidelines.* Such appointments should be made when the court determines that they will provide the most effective representation. In making this determination, the court should take into consideration whether the attorney represented the person during prior state court proceedings.

**35.** **(e) Services other than counsel.—**

(1) **Upon request.—**Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

(2) **Without prior request.—**Counsel appointed under this section may obtain, subject to later review, investigative, expert, or other services without prior authorization if necessary for an adequate defense. The total cost of services obtained without prior authorization may not exceed $150 and expenses reasonably incurred.

(3) **Maximum amounts.—**Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $300, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit.

18 U.S.C. § 3006A(e).

ready involved in the prisoner's case. We see nothing in these provisions mandating appointment of counsel in federal habeas or civil rights cases, either in the preparation of these pleadings or in subsequent litigation. For this reason, these provisions of federal law do not by themselves fulfill the Commonwealth's obligation under *Bounds* to ensure that prisoners on death row have access to the courts. *See also Ray v. Robinson,* 640 F.2d 474, 477–79 (3d Cir.1981) (18 U.S.C. § 3006A provides no funds for attorneys fees in civil actions by prisoners but district court has discretion under 28 U.S.C. § 1915 to appoint counsel in an *in forma pauperis* civil proceeding).

■ The record in this case also does not provide the necessary facts concerning legal assistance. The district court opined "that the objections of the plaintiffs to the modified paging system now in effect at Graterford and Huntingdon stem from a 'desire[] to double-check their court-appointed attorney,' not from a meaningful lack of access to the courts." *Peterkin,* 661 F.Supp. at 928 (quoting *Morrow v. Harwell,* 640 F.Supp. 225, 227 (W.D.Tenn. 1986)). However, we are unable to find a basis in the record for this conclusion. What we do find is an indication that when counsel for plaintiffs sought to place on the record evidence concerning the availability of counsel for death row prisoners considering whether to file a PCHA or habeas petition, the district court did not permit the witness to answer. Jt.App. at 177a.[36] In the absence of the record evidence that all death row prisoners have counsel for all relevant proceedings at all times during

their incarceration in the RHU, the district court's holding that there is no injury under *Bounds* is unsupported. We must therefore remand this case for further factual findings.

On remand the district court should develop a full record, after any necessary discovery, as to whether all death row inmates have attorneys, whether voluntary, appointed or retained, for all relevant proceedings. Having alleged insufficient legal assistance to provide access to the courts, the prisoners must be permitted to produce evidence that counsel are not available and that the prisoners must rely on other means of legal assistance to gain adequate and meaningful access to the courts. *See Cruz v. Hauk,* 515 F.2d 322, 332 (5th Cir. 1975) (Rosenn, J.); *Cruz v. Hauk,* 627 F.2d 710, 719 (5th Cir.1980). *See also Hooten v. Jenne,* 786 F.2d 692, 696–97 (5th Cir.1986). On remand, the district court may find that all death sentenced prisoners have counsel to assist them in preparing pleadings and in filing habeas and PCRA petitions and civil rights actions, and are not limited to counsel provided at the discretion of a court, whether state or federal, on the basis of an initial petition filed by an unassisted prisoner. If this is so, then none of the plaintiff-class can be held to have suffered an injury under *Bounds,* and the district court should hold, as it did here, that there is no *Bounds* problem. If the prisoners do not have counsel for each of these purposes, it will be necessary to resolve, under the analysis established by *Bounds, Valentine* and other relevant cases, whether the Commonwealth's paging system as institut-

---

**36.** The record reveals that the following exchange occurred among counsel for the prisoners, Mr. Presser, a prisoner on death row at Graterford, Mr. Fahy, counsel for the Commonwealth, Mrs. Vickers, and the district court.

Q  Do you have an attorney now sir?
A  Yes.
Q  Is he court appointed?
A  Yes.
Q  Do you know what will happen when it is time to file your post conviction remedies?
MS. VICKERS: Objection, Your Honor.
THE COURT: I will sustain the objection.
BY MR. PRESSER:
Q  Would you tell the Court where in the legal process you are, if you know?

A  I have no idea. I don't know because like I said I am not able to understand the law. I am not able to get anything from it. I tried, but I called him one time and the way he talked law to me, it is just not understandable to me. What area he is at now I don't know.
Q  Do you know how you intend to handle your Federal habeas?
A  No. I sent for some forms from the library law clinic. Lesko told me I might need them in the future. I believe I still have them in my box, that I put my name on one, I believe the name and some other information about myself, but that is as far as I could get. I believe I still have them.
Jt.App. at 177a–178a.

ed for death-sentenced prisoners, with or without inmate legal assistance or any other available legal assistance, provides a constitutionally sufficient right of access to the courts. We note that the Court in *Bounds* did not suggest that the right of access to the courts is always to be measured by a single invariant standard irrespective of the nature of the proceedings. It may well be that the scope of access to legal resources required under *Bounds* varies according to the proceeding. In proceedings directly implicating the validity of a death-sentenced prisoner's conviction, the availability of legal assistance from lawyers, rather than from other sources of legal knowledge, is more central to the vindication of prisoners' claims than in other civil claims filed by a death-sentenced prisoner, such as, for example, those complaining of conditions of confinement. In the latter category, it would appear that death sentenced prisoners share the same concerns as other prisoners, and therefore, should be governed by the same standards. *Cf. Giarrantano v. Murray*, 847 F.2d 1118, 1121–22 (4th Cir.1988) (en banc) ("Both society and affected individuals have a compelling interest in ensuring that death sentences have been constitutionally imposed. Moreover, the complexity and difficulty of the legal work involved in challenging a death penalty require particular safeguards in order to ensure meaningful access.").

### IV.  Conclusion

We affirm the district court's decision that the conditions of confinement of death-sentenced prisoners housed in the RHU's of the State Correctional Institutions at Graterford and Huntingdon do not violate the eighth amendment's prohibition on cruel and unusual punishment. We vacate the district court's decision that the prisoners have not demonstrated any injury under *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and remand this case for proceedings consistent with this opinion.