Richard A. **GERBER** and Charles Shumanis, Plaintiffs,

v.

Edward **SWEENEY**, et al., Defendants.

Nos. CIV.A. 02–241, CIV.A. 02–1645.

United States District Court, E.D. Pennsylvania.

Nov. 13, 2003.

---

1. A copy of the letter shall be docketed by the     Clerk of Court.

David R. Moffitt, Lynanne B. Wescott, Matthew M. Haar, Saul Ewing LLP, Philadelphia, PA, for Richard Allen Gerber, Charles Shumanis, III, Plaintiffs.

Stephen M. Vannatten, Cty of Lehigh Dept of Law, Department of Law, Allentown, PA, William J. Devlin, Jr., Devlin & Devine, Conshohocken, PA, for Edward Sweeney, Dale Miesel, James Bloom, Nancy Afflerbach, Cynthia Egizio, Carol Summers, George Weiser, Peter Seagraves, Nicole Rasely, Brian Dugan, Scott Dergham, Tom Koch, Chris Begel, Dave Minda.

David J. MacMain, Montgomery McCracken, Walker & Rhoads, LLP, Philadelphia, PA, Gregory D. Cote, Peter M. Coppinger, Gadsby Hannah LLP, Boston, MA, Sheryl L. Brown, Montgomery McCracken, Walker & Rhoads, LLP, Philadelphia, PA, for Richard Ethier.

Frank J. Lavery, Jr., Robert G. Hanna, Lavery Faherty Young & Patterson, P.C.,

Harrisburg, PA, James D. Young, Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, for Wexford Health Sources, Inc.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

In 02–241 ("*Gerber I* "), plaintiffs Richard Allen Gerber ("Gerber") and Charles Shumanis, III ("Shumanis") (collectively "plaintiffs"), who were inmates at the Lehigh County Prison ("LCP") at all relevant periods, filed a complaint under 42 U.S.C. § 1983 ("section 1983") against 16 institutional and individual defendants asserting various violations of their Eighth Amendment right to be free from cruel and unusual punishment.[1] All but four defendants, Carol Summers, George Weiser, Wexford Health Services and Peter Seagraves, filed motions to dismiss which were granted in part and denied in part in this court's order of March 7, 2003 (the "March 7, 2003 order"). *See Gerber v. Sweeney*, 2003 WL 1090187, 2003 U.S. Dist. LEXIS 3481 (E.D.Pa. Mar. 7, 2003).

In 02–1645 ("*Gerber II* "), plaintiff Gerber filed a complaint under section 1983 against many of the same defendants named in *Gerber I*.[2] In this case, Gerber alleges that excessive force was used on him during an altercation between Gerber and a prison officer that took place on November 30, 2001 and that the medical treatment he received following the altercation was inadequate. Both *Gerber I* and *Gerber II* were consolidated by this court's order for pretrial purposes.

Presently before this court are defendants' motions for summary judgment. Defendants assert that there are no genuine issues of material fact and that defendants are free from liability under the doctrine of qualified immunity. For the reasons that follow, summary judgment will be granted in favor of defendants and against plaintiffs on all the claims raised in defendants' motions.[3]

I. GERBER I: SUMMARY JUDGMENT IS PROPER ON PLAINTIFFS' PRISON CONDITION CLAIMS.

A. *Dismissal of the Remaining Claims Against Defendants Carol Summers, George Weiser, Wexford Health Services and Peter Seagraves.*

In the March 7, 2003 order, this court dismissed all claims against defendant Richard Ethier ("Mr.Ethier") and a number of other individuals collectively referred to as the Lehigh County defendants[4] except: 1) plaintiff Gerber's claim that he was subjected to a nutritionally inadequate diet while in segregation; 2) plaintiff Gerber's claim that he was denied adequate medical treatment and monitor-

---

1. The defendants in *Gerber I* are Edward Sweeney, Dale Miesel, James Bloom, Nancy Afflerbach, Cynthia Egizio, Carol Summers, George Weiser, Richard Ethier, Wexford Health Services, Inc., Peter Seagraves, Scott Dergham, Brian Dugan, Tom Koch, David Minda, Chris Begel, and Nicole Rasely.

2. The defendants in *Gerber II* are Edward Sweeney, Dale Miesel, James Bloom, Nancy Afflerbach, Cynthia Egizio, Carol Summers, George Weiser, Lisa Stofko, Wexford Health Services, Inc., Peter Seagraves, Scott Derg-

ham, Brian Dugan, Tom Koch, David Minda, Chris Begel, and Nicole Rasely.

3. The court need not reach the issue of qualified immunity because summary judgment is proper on the underlying Eighth Amendment claims.

4. Edward Sweeney, Dale Miesel, James Bloom, Nancy Afflerbach, Cynthia Ebizio, Nicole Rasely, Brian Dugan, Scott Dergham, Tom Koch, Chris Begel and Dave Minda are referred to collectively as the Lehigh County defendants.

ing while in segregation; 3) plaintiffs' claim that they were denied their right to regular exercise and recreation; and 4) plaintiffs' claim that, as a result of LCP's improper cleaning and sterilization of grooming utensils, plaintiffs were placed at a risk of contacting diseases. *Gerber,* 2003 WL 1090187, *6, 2003 U.S. Dist. LEXIS 3481 at *22–23.

Because motions to dismiss were not submitted by defendants Carol Summers, George Weiser, Wexford Health Services and Peter Seagraves at the time of the March 7, 2003 order, all claims against these four defendants remain. These four defendants now request this court to enter an order dismissing all those claims covered by the March 7, 2003 order as if they had joined in the original motion to dismiss.

A motion under Rule 12(b)(6) must be filed before any responsive pleading. Thus, the request of Carol Summers, George Weiser, Wexford Health Services and Peter Seagraves is untimely under this rule as answers have already been filed. A Rule 12(c) motion, on the other hand, may be filed after the pleadings are closed. Nevertheless, Rule 12(h)(2) provides that a defense of failure to state a claim upon which relief can be granted may also be made by motion for judgment on the pleadings. In this case, the court should apply the same standards as under Rule 12(b)(6). *See Turbe v. Gov't of Virgin Islands,* 938 F.2d 427, 428 (3d Cir. 1991).

In considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations made in the complaint and all reasonable inferences that can be drawn therefrom. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). The motion should be granted only if "no relief could be granted under any set of facts which could be proved." *Id.*

Following the March 7, 2003 order, plaintiffs have failed to proffer any new allegations with respect to the dismissed claims. Accordingly, for the reasons stated in the court's order of March 7, 2003, all claims that were dismissed against Mr. Ethier and the Lehigh County defendants are dismissed against Carol Summers, George Weiser, Wexford Health Services and Peter Seagraves.

B. *Summary Judgment is Appropriate on Gerber's Nutritionally Inadequate Diet Claim.*

■ Gerber's nutritionally inadequate diet claim centers around the fact that he was prescribed, by prison doctors, a special diet to deal with his chronic high blood pressure ("hypertension"). When Gerber arrived at LCP, his blood pressure was found to be elevated and poorly controlled. As part of a treatment regimen, doctors at LCP prescribed Gerber a special diet. According to Gerber, this diet required him to, among other things, drink three glasses of milk daily, consume copious amounts of liquids and have daily servings of juice. It is uncontested that, while in the segregation unit of LCP, instead of being given milk and juice, Gerber was provided with milk and juice substitutes in the form of cheese and fruit.[5] It is also uncontested that Gerber had unlimited access to water from a water fountain present in his cell.

5.  Gerber was removed from the general prison population and placed in the segregation unit of LCP from November 30, 2001 to January 26, 2002 as a result of an altercation with a prison officer. A misconduct hearing was held and Gerber received twenty days in dis-

ciplinary segregation. As a result of disruptive behavior in the segregation unit, Gerber received additional time in disciplinary segregation. The altercation with the officer is discussed in further detail below as the basis of Gerber's excessive force claim in *Gerber II.*

Food services to the inmates of LCP are provided by Canteen Correctional Food Services ("Canteen"), which is an operating division of Compass Group USA, Inc. Canteen is a private corporation under contract with the LCP. The manner, method and means by which Canteen fulfills its obligations is controlled by LCP. Mr. Ethier is the Food Services Director for Canteen. It is Mr. Ethier's responsibility to supervise the preparation and distribution of inmate meals consistent with LCP policies.

According to Mr. Ethier and the Lehigh County defendants, LCP eliminated the use of beverage containers in the segregation units and required Canteen to substitute solid foods in place of liquids for all inmates incarcerated in the segregation units, including inmates on medically prescribed diets. This restriction was imposed by Edward Sweeney ("Warden Sweeney") as a security measure because there were problems at LCP with inmates using cups and other liquid containers to hurl urine and feces. This problem necessitated elimination of beverage containers when providing inmates with meals. However, as noted above, inmates were allowed unlimited access to water from a water fountain which was inside the cell. Thus, inmates were not altogether denied access to liquids.

In response to the LCP policy, Mr. Ethier consulted with Barbara Wakeen ("Ms.Wakeen"), a registered dietician who developed the prison menu and inmate diets, about how to accomplish the required modifications in accordance with LCP policy. Ms. Wakeen made adjustments to the prison menu substituting solid foods in place of the liquids. In a memo to Warden Sweeney, dated November 17, 1998, Ms. Wakeen indicated that the "calories and nutrient content of the [substitutions] are nutritional [sic] adequate." To justify the substitutions, Ms. Wakeen attached a table to the letter itemizing the weight, calorie, protein, carbohydrate, fiber and fat content of the menu substitutions.

Gerber disagrees with Ms. Wakeen's assessment of the substitutions, particularly in view of his medical condition. As Gerber sees it, his diet was nutritionally inadequate and in "direct conflict with his medically prescribed diet for chronic high blood pressure." As an example, Gerber asserts that the substitution of cheese in place of milk deprived him of more 200 calories per day. Thus, Gerber challenges the "nutritional equivalency" of the food substitutions. However, other than his own conclusory statements that the diet was inadequate, he provides no evidence to support his assertions.

Meanwhile, defendants have provided affidavits from Ms. Wakeen stating that the substitutions made in Gerber's diet were not medically improper. Specifically, Ms. Wakeen states that Gerber's medically prescribed diet did not require a higher consumption of liquid than other medical or non-medical diets. Rather, the diet that Gerber was prescribed was a measured "caloric intake diet that restricts fat, cholesterol and sodium intake." Her affidavit provides a numerical comparison of the nutritional content of the original menu and the substitutions and she states in her affidavit that solid foods such as cheese and fruit which substituted liquids such as milk and juice were of comparable nutrient content and any loss of nutrient content was "marginal" or "insignificant."

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "mate-

rial" only if its existence or non-existence would affect outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 305–06 (3d Cir.2001) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

Although the moving party bears the burden of demonstrating the absence of a genuine issue of material fact, in a case such as this, where the non-moving party is the plaintiff, and therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306, 106 S.Ct. 2505 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment, *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, but rather, he "must go beyond the pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. U.P.S.*, 214 F.3d 402, 407 (3d Cir.2000). Finally, when deciding a motion for summary judgment, courts may not consider evidence that would be inadmissible at trial. *See Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387 n. 13 (3d Cir.1999).

▉ To establish an Eighth Amendment violation for conditions of confinement, plaintiff must show that prison conditions were dangerous, intolerable or shockingly substandard. *See Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.1985). The "inmate must allege both an objective element—that the deprivation was sufficiently serious—and a subjective element—that a prison official acted with a deliberately culpable state of mind, i.e., deliberate indifference." *Nami v. Fauver*, 82 F.3d 63, 67 (3d. Cir.1996) (relying on *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

Here, Gerber has provided no countervailing evidence to raise a genuine issue of material fact on his nutritionally inadequate diet claim. Gerber provides nothing more than his unsupported assertions that he was supposed to drink copious amounts of water and his speculative statements that cheese and fruit were not adequate substitutes for milk and juice. Based on the evidence produced by Gerber, a reasonable jury would not be able to find that Gerber suffered any deprivation, much less a "serious deprivation". *Seiter*, 501 U.S. at 304, 111 S.Ct. 2321; *see also Williams v. Lehigh Dep't of Corrections*, 79 F.Supp.2d 514, 518. Indeed, the record shows that Gerber's hypertension *improved* after he left the segregation unit on February 14, 2002.[6] Accordingly, Gerber cannot satisfy the objective prong of the *Seiter* test.

Further, there is no evidence that any of the named defendants acted with a culpable state of mind to deprive Gerber of a nutritionally adequate diet. The food substitutions in the segregation unit menu were necessitated by a LCP security measure and steps were taken by those trained

---

**6.** His blood pressure decreased from 220/130 on the date of his incarceration, September 21, 2001, to 126/80 on February 14, 2002.

and qualified to do so to ensure that the substitutions were of comparable nutritional and caloric content. Rather than being rooted in deliberate indifference, the policy appears to be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Accordingly, defendants are entitled to summary judgment on this claim.

C. *Summary Judgment is Also Appropriate on Gerber's Inadequate Medical Treatment Claim While In Segregation.*

■ On November 30, 2001, Gerber was involved in a physical altercation with a LCP officer. Numerous officers were required to restrain Gerber and a "code red" was subsequently called. Gerber alleges that after he was handcuffed, he was struck in the eye by an officer. Gerber was removed from the general prison population and taken to administrative segregation. Within 15 minutes after the incident, Lisa Stofko ("Nurse Stofko"), a prison nurse, arrived in the administrative segregation unit to examine Gerber's eye.[7] According to Nurse Stofko, it was standard procedure for an officer to call the medical department in the event that an inmate was injured during a code red.

Nurse Stofko chose not to enter the administrative segregation unit in which Gerber was placed. She has testified that entry into the cell was not required when examining prisoners if she felt her safety was threatened. Instead, she chose to examine Gerber through a window on the door to Gerber's unit. She noted on Gerber's medical chart that Gerber's pupils were round and reactive to light and that

he had some bruising around his eye, i.e., a "black eye." After examining Gerber, she ordered that Gerber take some Motrin and apply ice on the eye.

Gerber asserts that Nurse Stofko failed to adequately treat him because she examined him through a window in the segregation unit, where the lighting was allegedly poor. In Gerber's words, "she didn't conduct the necessary evaluation." Moreover, Gerber asserts that he asked Nurse Stofko to attend to "various [other] injuries" which he was allegedly suffering from at the time. According to Gerber, Nurse Stofko's response was that she was only concerned about the eye and that Gerber would have to place a sick call to have the other injuries looked at.[8]

■ Gerber also asserts that, while in the segregation unit, he suffered a "laceration" on his right heel on December 27, 2001. Although he allegedly made several requests to receive a tetanus shot, he did not receive one until March 12, 2002.[9]

■ In addition, Gerber alleges inadequate treatment relating to his hypertension. According to Gerber, Dr. Eric Von Kiel ("Dr. Von Kiel"), an independent contractor who served as defendant Wexford Health Service's medical director at LCP, prescribed weekly blood pressure monitoring for Gerber due to his hypertension. However, Gerber alleges that his blood pressure was measured haphazardly and without regularity while he was in the segregation unit because "his blood pressure was recorded by prison medical staff only five times in the twelve weeks from September 27, 2001, to December 18, 2001." "Such inconsistent medical moni-

---

7. Nurse Stofko is not named as a defendant in *Gerber I*. She is, however, named as a defendant in *Gerber II*.

8. A sick call is the standard procedure for making requests for medical assistance.

9. Gerber also claims that he sought a Hepatitis C test, but was ignored by prison medical staff and officials.

toring," Gerber concludes, put him "at risk for severe repercussions due to his chronic blood pressure."

■ To succeed on a claim of inadequate medical treatment in violation of the Eighth Amendment, Gerber must demonstrate "deliberate indifference to serious medical needs . . . ." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d·251 (1976). "The standard enunciated in *Estelle* is two-pronged: '[i]t requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." ' *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987) (quoting *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978)). Simple medical malpractice is insufficient to present a constitutional violation. *Estelle* at 106, 97 S.Ct. 285.

■ A medical need is "serious" if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Lanzaro,* 834 F.2d at 347. The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment or the consequences of denying or delaying treatment. *Id.* Where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is also considered serious. *Id.*

In *Lanzaro,* the Third Circuit also noted that deliberate indifference could exist in a variety of circumstances, including where " 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide care' " or where "short of absolute denial . . . 'necessary medical treatment is . . . delayed for non-medical reasons,' " or where " 'prison authorities prevent an inmate from receiving recommended treatment.' " *Lanzaro,* 834 F.2d at 346 (citations omitted).

The evidence shows that Gerber's blood pressure was checked on September 26, 2001 after his incarceration at LCP. On September 27, 2001, Dr. Von Kiel evaluated Gerber for his hypertension and, at that time, developed a treatment plan consisting of cardiac medication, an EKG, weekly blood pressure checks, a Healthy Heart I diet for three months, and a follow-up examination in four weeks or sooner if needed. Prior to his transfer to the segregation unit on November 30, 2001, Gerber was seen by the medical department on September 30, October 22 and November 19.

On December 7, 2001 Gerber had a follow up visit during which his blood pressure was checked. On December 18, 2001, Gerber saw the medical staff at LCP again. During this visit, his prescription for medication was renewed and he received instructions to have his blood pressure checked every two months. On January 8, 2002 and January 22, 2002, Gerber again had his blood pressure checked. On January 27, 2002, Gerber again saw a doctor who checked his blood pressure and prescribed a Healthy Heart II diet.

Defendants are entitled to summary judgment on Gerber's inadequate medical treatment claim. There is insufficient evidence to show that Gerber's hypertension constituted a "serious" medical need, particularly in light of the fact that he was taking hypertension medication at all times during his stay in the segregation unit and the fact that he was on a medically prescribed diet. As noted previously, his blood pressure actually *improved* when he left the segregation unit.

■ Even assuming, arguendo, that Gerber's condition did constitute a serious medical need, Gerber has proffered insufficient evidence to demonstrate that any of the defendants acted with deliberate indifference toward his medical needs. His

blood pressure was monitored on numerous occasions while he was in the segregation unit (at least five times during a two month span). That it was not monitored every week as prescribed by Dr. Von Kiel does not indicate that his treatment was inadequate. "[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). At most, the failure to monitor according to the schedule prescribed by Dr. Von Kiel evidences negligence.

With respect to the treatment he received by Nurse Stofko, Gerber has provided no evidence as to how her treatment was insufficient, what harm or risk of additional injury Gerber suffered as a result of her alleged insufficient treatment, nor has he provided any evidence that Nurse Stofko exercised deliberate indifference in her manner of treating Gerber or telling him to place a sick call.

As for the "laceration" on his foot. Gerber has proffered absolutely no evidence, aside from his own allegations, indicating how severe (or minor) the injury was, whether or not a tetanus shot was necessary, and what harm he suffered by the delay in receiving a tetanus shot. Evidence supporting his assertion that a hepatitis C test was necessary is equally insufficient.

With respect to his claims, Gerber has shown, at most, that some of his specific requests for medical treatment were not acknowledged by medical staff. However, "[i]nadequate medical treatment claims under § 1983 must be denied where the medical treatment provided by officials does not comport to the inmate's specific requests 'since complaints merely reflect a disagreement with the doctors over the proper means of treatment." ' *Palladino v. Wackenhut Corrections,* 1998 WL 855489, *3, 1998 U.S. Dist. LEXIS 19173 *7–8 (E.D.Pa. Dec. 10, 1998) (quoting *Bor-*

*ing v. Kozakiewicz,* 833 F.2d 468, 473 (3d Cir.1987)).

In view of the above, summary judgment is appropriate with respect to Gerber's inadequate medical treatment claim. Gerber has failed to establish the seriousness of the harm he claims to have suffered or a culpable state of mind on the part of defendants with respect to his treatment. In every instance where medical care was necessary, Gerber received it. He now challenges the adequacy of the care received based on his own bare assertions. "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support and Eighth Amendment claim." *Norris v. Frame,* 585 F.2d 1183, 1186 (3d Cir.1978).

D. *Summary Judgment is Proper on Plaintiffs' Claim That They Were Denied Their Right to Regular Exercise.*

Gerber and Shumanis claim that they were denied meaningful access to recreation while in the LCP segregation unit. Specifically, they claim that they were denied winter coats even though their outdoor recreation area became cold during the winter months and that they were further denied hats, gloves, and shoes, even when snow came inside the recreation area. Gerber and Shumanis also complain of the lack of an indoor recreation facility at LCP. Gerber acknowledges that a request for a coat was made on December 21, 2001 and that a coat was provided to him on December 26, 2001.

The Lehigh County defendants assert that the clothing provided to plaintiffs was consistent with prison policy. Sandals are provided to prisoners as footwear instead of shoes in order to prevent prisoners from getting a secure footing off of which they can physically attack guards or inmates.

Hats and gloves are not provided because these can be used to conceal weapons, hide contraband, and ease the handling of weapons.

"There is no question that meaningful recreation 'is extremely important to the psychology and physical well-being of inmates.'" *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir.1988). However, plaintiffs have again not shown any substantial deprivation or ensuing harm. Plaintiffs have "made no showing that protracted periods of inclement weather, which would substantially foreclose outdoor activity, occur with any frequency." *Id.* In addition, "the lack of indoor facilities might be less than ideal ...[but] does not constitute a violation of ... eighth amendment rights." *Id.* at 1031–32. Even if the weather was sufficiently cold on certain days to prevent exercise, short-term deprivations of exercise do not rise to constitutional levels. *See, e.g., Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir.1997); *Harris v. Fleming*, 839 F.2d 1232 (7th Cir.1988). Therefore, defendants are entitled to summary judgment.

E. *Summary Judgment in Favor of Defendants is Proper on Plaintiffs' Claim That They Were Placed at a Risk of Contacting Diseases Due to Alleged Unsanitary Conditions.*

■ Plaintiffs' claim that they were exposed to risks of exposure to disease due to the alleged sanitary conditions at LCP also cannot withstand summary judgment. The sanitary issues raised by Gerber and Shumanis relate to the fact that LCP provided prisoners with unlicensed barbers and required prisoner's to share electric shavers. Gerber and Shumanis do not claim that they were harmed by any of these practices, only that they were placed "at risk for disease."

During Gerber's incarceration, LCP permitted unlicensed barbers to cut prisoner's hair, including Gerber's and Shumanis'.[10] Gerber and Shumanis claim that this practice "potentially" exposed them to diseases.

With respect to the shavers, the record shows that electric shavers were provided to prisoners who could not afford their own.[11] LCP policy is to provide prisoners with both a brush and disinfectant and instructions to clean the shavers before and after each use. Therefore, each shaver was cleaned twice before a prisoner used. However, Gerber and Shumanis claim that such practices were clearly inadequate to prevent the spread of disease.

Conclusory statements and allegations aside, Gerber and Shumanis have not provided any evidence that getting haircuts from unlicensed barbers or sharing electric shavers put them at any additional risk of contracting diseases nor have they described what diseases caused them concern. Although Gerber claims that he requested a Hepatitis C test, he has not shown a link between Hepatitis C and haircuts by unlicensed barbers or the LCP policy with respect to cleaning electric shavers. Thus, there is insufficient evidence to support an allegation of serious or substantial harm. In fact, Gerber and Shumanis acknowledge that "medical records show no evidence of problems arising from the shaving or the haircuts." For these reasons, summary judgment in favor of defendants is proper.

---

10. However, once Gerber informed LCP that licensed barbers were required by Pennsylvania law, LCP examined the issue and changed its policy by providing prisoners with access to licensed barbers.

11. According to defendants, razors were not permitted because they could potentially be used as weapons. The court finds this rationale to be axiomatic.

## II. GERBER II: GERBER'S EXCESSIVE FORCE CLAIM AGAINST SGT. DERGHAM AND THE OTHER LEHIGH COUNTY DEFENDANTS.

### A. *Factual Background.*

On November 30, 2003, Gerber was in the general prison population of LCP. While playing cards in the recreation area, Gerber became excited and "smacked" a card on the table. Defendant Scott Dergham ("Sgt.Dergham") requested that Gerber approach the podium in the center of the area, approximately fifteen feet from the card table. As Gerber approached the podium, Sgt. Dergham ordered that Gerber return to his cell. Gerber alleges that as he turned his back to Sgt. Dergham, Sgt. Dergham grabbed him from behind and jumped on his back.

A fight ensued between Gerber and Sgt. Dergham and a "code red" was called to indicate an emergency situation in the prison. Numerous officers were called to the scene and after significant resistance, Gerber was finally handcuffed and subdued. Gerber alleges that after he was handcuffed, Sgt. Dergham approached him and punched him with a closed fist in the right eye. After the punch, Gerber admits to lunging at Sgt. Dergham. At this point, the other officers pushed Gerber to the floor and shackled him. Gerber was eventually carried off to the restricted housing unit.

As a result of the incident of November 30, 2001, Gerber was charged with four counts of misconduct: disruption, refusing verbal/written orders, disrespect to staff, and threats to staff. A misconduct hearing was held on December 4, 2001 in which Gerber pled guilty to the disruption count and was found guilty of the remaining three counts. Gerber was sentenced to twenty days in disciplinary segregation.

Gerber claims that Sgt. Dergham used excessive force in violation of the Eighth Amendment when he assaulted Gerber. Gerber also alleges that Warden Sweeney, Assistant Warden Dale Miesel ("Asst. Warden Miesel") and Deputy Warden of Security James Bloom ("Deputy Warden Bloom") should be held liable for their actions following the November 30, 2001 incident. Specifically, Gerber asserts that Warden Sweeney, Asst. Warden Miesel, and Deputy Warden Bloom alleged failure to respond to Gerber medical concerns following the incident "constitute deliberate" indifference. Gerber also asserts that the failure of Warden Sweeney, Asst. Warden Miesel, and Deputy Warden Bloom to preserve a videotape which recorded the November 30, 2001 incident subjected Gerber to the misconduct hearing and the twenty days of disciplinary segregation. This, Gerber argues, "constitutes deliberate indifference to Mr. Gerber's civil rights because Defendants Miesel and Bloom knew that Mr. Gerber faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it."

As Sgt. Dergham has not moved for summary judgment, the only issue before this court is whether the other defendants named in *Gerber II* are entitled to summary judgment.

### B. *Discussion.*

It is an established principle that the doctrine of respondeat superior is not available to establish liability under section 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, particularized "[a]llegations of personal direction or of actual knowledge and acquiescence" are necessary to show personal involvement. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988). Gerber does not allege that Warden Sweeney, Asst. Warden Miesel or Deputy Warden Bloom (or any of the oth-

er defendants) personally directed or acquiesced to Sgt. Dergham's alleged assault on Gerber.[12]

As indicated above in the discussion relating to *Gerber I*, Gerber has not provided sufficient evidence to create a genuine issue of material fact that he was denied adequate medical treatment following the November 30, 2001 incident. Therefore, just as summary judgment is appropriate in *Gerber I* on this claim, summary judgment is also proper in favor of Warden Sweeney, Asst. Warden Miesel and Deputy Warden Bloom in this respect. *See also Durmer*, 991 F.2d at 69(finding that prison officials have no duty to respond to medical complaints when the complaining prisoner is already being treated by a prison doctor).

■■■ Gerber's claim that Warden Sweeney, Asst. Warden Miesel and Deputy Warden Bloom should be liable because they failed to preserve the videotape of the November 30, 2001 incident and that this failure caused Gerber to be subjected to a misconduct hearing also cannot survive summary judgment. According to defendants, the videotape was erased pursuant to LCP policy which provided that tapes are to be erased after three months unless they are singled out for preservation. The justification for this policy is to recycle tapes.[13] Gerber alleges that Asst. Warden Miesel and Deputy Warden Bloom knew of the November 31, 2001 incident "and did not flag the videotape, and instead allowed [Gerber] to be subjected to an investigatory hearing and twenty days of disciplinary segregation."

The court concludes that, even assuming the defendants failed to preserve the videotape and that this failure was the result of a culpable state of mind, no reasonable jury could find that holding a misconduct hearing to determine whether Gerber violated prison rules caused Gerber serious harm sufficient to satisfy the objective prong of *Seiter*. Rather, the misconduct hearing gave Gerber an opportunity to vindicate himself from the allegations of misconduct, even if the videotape was not available to him. Thus, the court finds that the allegations, even if true, are insufficient to give rise to an Eighth Amendment claim. *See Rivers v. Horn*, 2001 WL 312236, *2, U.S. Dist. LEXIS 3613 *8 (E.D.Pa. Mar. 29, 2001)("It is difficult to understand how a misconduct hearing, even if tainted by the deficiencies alleged, could constitute cruel and unusual punishment.").

Under certain circumstances, the failure of prison officials to preserve evidence which may be used in a disciplinary hearing of a prisoner may violate that prisoner's due process rights if the prison officials have acted in bad faith. *Griffin v. Spratt*, 969 F.2d 16, 21 (3d Cir.1992). Gerber, however, does not make such a due process claim here perhaps because "the uncontradicted evidence indicates that it was standard procedure to discard [the evidence], and the officers provided a seemingly legitimate justification for this policy." *Id.*

In view of the above, the court finds that there are no genuine issues of material

---

12. Gerber does indicate in his complaint that Sgt. Dergham was allegedly "well known for incidents relative to mine, therefore the administration was not blind to his conduct." The record indicates that Dergham was involved in only one other incident with a prisoner and that he was disciplined accordingly by the LCP. However, isolated incidents cannot establish a policy, practice or custom.

*Black v. Stephens*, 662 F.2d 181, 199–200 (3d Cir.1981) (two alleged excessive force incidents followed by a failure to discipline insufficient to establish a policy). Thus, Gerber cannot attach liability on this basis.

13. Gerber does not contest the legitimacy of this policy.

fact on the issue of liability with respect to Warden Sweeney, Asst. Warden Miesel and Deputy Warden Bloom and the other defendants. Accordingly, summary judgment in their favor is appropriate.

## III. CONCLUSION

Summary judgment is appropriate on all of the claims against defendants except Gerber's excessive force claim against Sgt. Dergham.

An appropriate order follows.

### *ORDER*

**AND NOW**, this 13th day of November 2003, for the reasons set forth in the accompanying memorandum, it is hereby **ORDERED** that defendants' motions for summary judgment (doc. nos.62, 63, 64) is **GRANTED**.

**AND IT IS SO ORDERED.**